UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SANOFI-AVENTIS US, LLC,

        Plaintiff,

  v.

ROBERT F. KENNEDY, JR, Secretary of
Health and Human Services, et al.,

        Defendants.

Civil Action No. 24-3496 (DLF)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THEIR CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

Table of Authorities ........................................................................................................... ii

introduction ........................................................................................................................ 1

     I.     Statutory and Regulatory Background. ................................................................. 1

     II.    Factual Background. ............................................................................................. 4

Legal Standards .................................................................................................................. 6

Argument ............................................................................................................................ 7

     I.     The Agency's Decision to Require Agency Approval Before Instituting a Credit Model is Consistent with the 340B Statute. ......................................................... 7

     II.    The Agency Decision to Prohibit Plaintiff from Instituting an Unapproved Credit Model was Not Arbitrary and Capricious. ........................................................... 14

           A.     The Agency's Decision Preserves the 340B Program As It has Operated for Over Thirty Years. .................................................................................... 15

           B.     Plaintiff's Proposed Credit Model Would Shift Responsibility for Monitoring 340B Transactions for Duplicate Discount and Diversion Violations from the Agency to the Manufacturers. .................................. 19

Conclusion ........................................................................................................................ 23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Astra USA, Inc. v. Santa Clara County,*
   563 U.S. 110 (2011) ...........................................................................................passim

*Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ...................................................................................................22

*Cares Cmty. Health v. Health and Human Serv.,*
   944 F.3d 950 (D.C. Cir. 2019) ....................................................................................9

*Christensen v. Harris County,*
   529 U.S. 576 (2000) ...................................................................................................10

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ..........................................................................................6, 7, 15

*City of South Bend v. Surface Transp. Bd.,*
   566 F.3d 1166 (D.C. Cir. 2009) ..................................................................................7

*Comm'n,*
   113 F.4th 943 (D.C. Cir. 2024) ...............................................................................6, 7

*Comm'n,*
   888 F.3d 477 (D.C. Cir. 2018) ....................................................................................7

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) .....................................................................................................7

*CSL Plasma Inc. v. Customs & Border Prot.,*
   628 F. Supp. 3d 243 (D.D.C. 2022) ...........................................................................22

*Escobedo v. Green,*
   602 F. Supp. 2d 244 (D.D.C 2009) ............................................................................14

*FCC v. Nat'l Citizens Comm. for,*
   *Broad.,* 436 U.S. 775 (1978)........................................................................................7

*Fed. Commc'n Comm'n v. Fox Television Stations,*
   556 U.S. 502 (2009) ...................................................................................................15

*Fed. Educ. Ass'n Stateside Region v. FLRA,*
   104 F.4th 275 (D.C. Cir. 2024) ............................................................................11, 12

*Loper Bright Enters. v. Raimondo,*
   144 S. Ct. 2244 (2024) ............................................................................................6, 7

*Marsh v. Or. Natural Res. Council,*
   490 U.S. 360 (1989) ...................................................................................................15

*Marx v. Gen. Revenue Corp.,*
   568 U.S. 371 (2013) .....................................................................................................9

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................. 14, 18, 19, 22

*Novartis Pharms. Corp. v. Johnson,*
   102 F.4th 452 (D.C. Cir. 2024) ..................................................................................10

*Rubin v. Islamic Republic of Iran,*
   583 U.S. 202 (2018) .....................................................................................................9

*SEC v. Fed. Lab. Rels. Auth.*,
  568 F.3d 990 (D.C. Cir. 2009)...........................................................................7
*Tourus Records, Inc. v. Drug Enforcement Admin.*,
  259 F.3d 731 (D.C. Cir. 2001).........................................................................14
*U.S. Sugar Corp. v. EPA*,
  113 F.4th 984 (D.C. Cir. 2024)..........................................................................6
*Van Buren v. United States*,
  593 U.S. 374 (2021)...........................................................................................7
*Xcel Energy Servs. Inc. v. FERC*,
  41 F.4th 548 (D.C. Cir. 2022).........................................................................22

## Statutes

5 U.S.C. § 706(2)(A)...............................................................................6, 7, 14
42 U.S.C. § 256b (1992).............................................................................................1
42 U.S.C. § 256b(a)(1)....................................................................................passim
42 U.S.C. § 256b(a)(4).............................................................................2, 3, 8
42 U.S.C. § 256b(a)(5)(A).....................................................................................20
42 U.S.C. § 256b(a)(5)(D).....................................................................................21
Pub. L. No. 102-585...............................................................................................1
U.S.C. § 256b(a)(1)...........................................................................................8, 15

## Regulations

42 C.F.R. § 10.10(c).........................................................................................13, 14
63 Fed. Reg. 35.................................................................................................13, 18

Defendants the Secretary of Health and Human Services, and the Administrator of the Health Resources and Services Administration ("the Agency") respectfully submit this memorandum of points and authorities in support of their cross motion for summary judgment and in opposition to Plaintiff's motions for summary judgment.

## INTRODUCTION

The Court should grant summary judgment in Defendants' favor because the Agency's decision to prevent Plaintiffs from implementing a credit model to effectuate 340B price reductions was within its statutory authority. Moreover, Plaintiff's proposed "credit" model would have upended the way the 340B Program has operated for more than thirty years and thus the Agency's decision to prevent Plaintiff from implementing that model "at this time" was not arbitrary and capricious. In fact, Plaintiff's proposed credit model would have impermissibly shifted responsibility for monitoring covered entities' compliance with the 340B statute's duplicate discount and diversion prohibition provisions from the Agency to itself.

## BACKGROUND

### I.    <u>Statutory and Regulatory Background.</u>

In 1992, Congress created the 340B Program, administered by the Secretary of Health and Human Services, through which certain safety-net healthcare providers, including hospitals, community health centers, and other federally funded entities (collectively known as "covered entities") serving low-income patients could receive drug price reductions. See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71 (1992), codified at § 340B, Public Health Service Act, 42 U.S.C. § 256b (1992). The program has dual benefits: Drug discounts to "enable these entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services," and may directly benefit

uninsured and underinsured patients when covered entities opt to pass along the discounts by helping patients afford costly medications. H.R. Rep. No. 102-384, pt. 2, at 12 (1992).

To achieve these benefits, Congress directed the Secretary to enter into an agreement, known as a Pharmaceutical Pricing Agreement ("pricing agreement") "with each manufacturer of covered outpatient drugs under which the amount required to be paid … to the manufacturer for [such] drugs . . . purchased by a covered entity . . . does not exceed [the ceiling price]." 42 U.S.C. § 256b(a)(1). The ceiling price is derived from components of each drug's "average" and "best" price as calculated under the Medicaid Drug Rebate Program. *Id.* Each pricing agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." *Id.*; see also, 58 Fed. Reg. 27,289, 27,291 (May 7, 1993). In essence, the statute requires participating drug manufacturers to offer their pharmaceutical products to covered entities at reduced cost. 58 Fed. Reg. at 27,289. Examples of qualifying covered entities include federally qualified health centers that serve populations such as the homeless, uninsured, and rural populations, family planning clinics, entities providing outpatient early intervention services for HIV diseases, state-operated AIDS drug assistance programs, black lung clinics, hemophilia diagnostic treatment centers, Native Hawaiian health centers, and disproportionate share hospitals, i.e. hospitals that serve a disproportionate share of Medicare, Medicaid, and other low income uninsured patients. *Id.;* see also 42 U.S.C. § 256b(a)(4).

To incentivize pharmaceutical companies to participate in the 340B Program, Congress conditioned drug makers' access to a federal benefit—coverage of their products under Medicaid and Medicare Part B—on manufacturers' participation in the program. *Id*. § 1396r-8(a)(1); *id.* § 256b(a). Pharmaceutical companies thus may opt out of providing discounted drugs to safety-net

providers and their low-income patients, but then lose access to drug coverage under federal health-insurance programs.  42 U.S.C. § 256b(a)(4) (defining "covered entity")

Although the statute "has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)," the statute "provides that the amount to be paid to the manufacturers for covered drugs takes "'into account any rebate or discount, as provided by the Secretary.'"  62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (quoting 42 U.S.C. § 256b(a)(1)). Guidance published when the 340B Program first began recognized the use of discounts and allowed rebates only in the context of covered entities recouping the 340B price for purchases made prior to the initial implementation of the 340B Program.  58 Fed. Reg. at 27291-92. Historically, price reductions have been effectuated through upfront discounts on the purchase price, but the Agency has made exceptions for instance in the case of drugs sold to a certain category of covered entities called AIDS Drug Assistance Programs.  62 Fed. Reg. at 45,824.

Importantly, "the pricing agreements that the manufacturers sign to opt into the 340B Program are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary." *Astra USA, Inc. v. Santa Clara County,* 563 U.S. 110, 113 (2011).  Thus, when a manufacturer signs a pricing agreement, the manufacturer is agreeing to the "terms and conditions" of the program as stated in the statute.  Manufacturers that do not comply with the terms of the pricing agreement, which evidences manufacturers' assent to opt-in to the requirements of the statute, can be subject to termination from the 340B Program and civil monetary sanctions.    42 U.S.C. § 256b(d)(1)(B)(vi).

II.     **Factual Background.**

Plaintiff Sanofi-Aventis US is a pharmaceutical company that has entered into a pharmaceutical pricing agreement (hereinafter, "pricing agreement") with the Agency. AR 036-47. On November 1, 2024, Plaintiff notified the Agency of Plaintiff's intent to implement a "credit model" for the 340B Program. AR 348. In submitting its proposal, Plaintiff told the Agency that unless the Agency objected by November 14, 2024, Plaintiff would assume that the Agency agreed with the credit model and would note that understanding in its public announcement on November 15, 2024. AR 349.

Plaintiff's proposed credit model would change the way it effectuates 340B price reductions. AR 350. Rather than provide upfront discounts to covered entities, Plaintiff would offer a rebate in the form of credits. *Id.* Specifically, covered entities would place an order for Sanofi's drugs to wholesalers at the wholesale acquisition cost. *Id.* After receiving the drugs and dispensing them to eligible patients, the covered entity would submit purchase, pharmacy claims and medical claims data to Plaintiff through a digital platform. AR 410-11. Plaintiff would then provide a credit to the covered entity for the difference between the wholesale acquisition cost and the 340B ceiling price, but only if Plaintiff "approved" the covered entity's claim. AR 350.

Plaintiff claims that it will pay the credit "before the wholesaler's bill to the covered entity becomes due." *Id.* However, payment would be conditioned on the covered entity submitting "purchase and claims data" within thirty days of dispensing a drug, and Plaintiff's validation that the purchase was a 340B eligible purchase. AR 410. For hospital covered entities, Plaintiff would pay the credit no more than seven days "after the covered entity submits data sufficient to trigger a full package accumulation." *Id.* Plaintiff intended to use this model for 340B sales to critical access hospitals, disproportionate share hospitals, rural referral centers, sole community hospitals, and consolidated health centers beginning January 1, 2025. AR 350

On November 12, 2024, the Agency informed Plaintiff that "[t]o date, the Secretary has not provided for such a credit model[.]" AR 380 (quoting 42 U.S.C. § 256b(a)(1)). The Agency cautioned Plaintiff that "implementing such a proposal at this time would be inconsistent with the statutory requirements for the 340B Program, which require the approval of Sanofi's proposed credit model." AR 380. The Agency also posed a series of questions to Plaintiff to better understand the planned credit model. AR 380-82. Three days later, Plaintiff responded that it "respectfully disagree[d]" with the Agency's determination that the 340B statute required Plaintiff to obtain Agency approval before implementing the credit model. AR 383. Plaintiff also provided responses to the Agency's questions, AR 384-92, and advised the Agency that unless Plaintiff received a response by November 21, 2024, "expressly stating that Sanofi's Credit Model was not consistent with Section 340B's 'must offer' requirement," Plaintiff would notify the covered entities on November 22, 2024, of its intention to implement the credit model beginning January 6, 2025. AR 384. Plaintiff's announcement to the covered entities would note that the Agency "has not substantively objected" to the credit model "and instead only incorrectly suggested that the agency must pre-approve the Credit model's launch." *Id.*

On November 21, 2024, the Agency responded to Plaintiff that the Agency has "recently received inquiries from manufacturers related to different proposed rebate models for the 340B Program," and that it was "reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program." AR 406. The Agency reiterated that implementing a rebate proposal without Secretarial approval would violate the 340B statute. *Id.* Despite this message, the following day, Plaintiff issued an announcement to the covered entities that it intended to implement the credit model beginning January 6, 2025, for disproportionate share hospitals, critical access hospitals, rural referral centers, and sole community hospitals, and

on March 1, 2025, for consolidated health centers.  AR 408, 410.  The announcement advised the covered entities that, "340B pricing will no longer be available through wholesalers for the applicable covered entity types," but instead would be available through a credit.  AR 410.

Three weeks later, the Agency issued a warning to Plaintiff that the "unapproved credit proposal" violates Plaintiff's "obligations under the 340B statute," and that the Agency expected Plaintiff to "cease implementation" of the proposal.  AR 424.  The Agency objected to Plaintiff unilaterally charging covered entities the wholesale acquisition cost and warned that failure to cease implementation of the proposal could lead to termination of Plaintiff's pricing agreement. AR 425.  On December 16, 2024, Plaintiff responded that it disagreed with the Agency's position that the 340B statute requires Agency approval before implementing a credit model, but nonetheless would "pause implementation" of the planned credit model.  AR 426.  That same day, just six weeks after Plaintiff first contacted the Agency about their planned credit model, Plaintiff filed this lawsuit.  *Id.; see also* Compl.

## LEGAL STANDARDS

The Administrative Procedure Act ("APA") provides that final agency action can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–15 (1971); see also 5 U.S.C. § 706(2)(A), (E).  Courts review de novo issues of statutory interpretation and "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024)*; see also U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 997 (D.C. Cir. 2024). "Courts must 'interpret statutes, no matter the context, based on the traditional tools of statutory construction.'" *Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 947 (D.C. Cir. 2024) (quoting

*Loper Bright*, 144 S. Ct. at 2268). "Therefore, when 'addressing a question of statutory interpretation, we begin with the text.'" *Id.* at 948 (*quoting City of Clarksville v. Fed. Energy Regul. Comm'n*, 888 F.3d 477, 482 (D.C. Cir. 2018)).

Agency action is arbitrary and capricious if based on an unlawful interpretation of statute or regulations, or if it is "not rational and based on consideration of the relevant factors." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978). The Secretary's factual findings can be set aside only if they are "unsupported by substantial evidence" in the administrative record. 5 U.S.C. § 706(2)(A); *see also Overton Park*, 401 U.S. at 413–15. The substantial evidence standard is satisfied if the final agency decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966) (internal quotation marks and citation omitted); *see also City of South Bend v. Surface Transp. Bd.*, 566 F.3d 1166, 1170 (D.C. Cir. 2009). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (citations omitted); *SEC v. Fed. Lab. Rels. Auth.*, 568 F.3d 990, 995 (D.C. Cir. 2009).

## ARGUMENT

**I.    The Agency's Decision to Require Agency Approval Before Instituting a Credit Model is Consistent with the 340B Statute.**

When interpreting a statute, the court starts with the text of the statute. *Van Buren v. United States*, 593 U.S. 374, 381 (2021) ("We start where we always do: with the text of the statute.") The text supports the Agency's position that Secretarial approval is required before a manufacturer initiates any rebate regime. In relevant part, the statute states,

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account

any rebate or discount, as provided by the Secretary) to the manufacturer for
covered outpatient drugs . . . purchased by a covered entity on or after the first day
of the first month that begins after the date of the enactment of this section, does
not exceed [the ceiling price].

42 U.S.C. § 256b(a)(1). The statute instructs the Secretary to "enter into an agreement with each

manufacturer of covered outpatient drugs . . ." *Id.* The "agreement" is the Pharmaceutical Pricing

Agreement. AR 036-47. That agreement is "a uniform agreement[] that recite[s] the

responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary." *Astra*

*USA*, 563 U.S. at 113. Under the pricing agreement, "the amount required to be paid' "to the

manufacturer for covered outpatient drugs" "purchased by a covered entity" "does not exceed" the

ceiling price. 42 U.S.C. § 256b(a)(1). Put simply, the manufacturer enters into an agreement with

the Secretary where the manufacturer agrees not to charge covered entities more than the ceiling

price for covered outpatient drugs. *Id*

Crucially, the amount that the manufacturer may charge a covered entity must take "into

account any rebate or discount, as provided by the Secretary." *Id.* "Provided" is the past tense of

"provide," a common definition of which is "to have as a condition" or to "stipulate." Provide,

Merriam-Webster.com, https://www.merriam-webster.com/dictionary/provide. Thus, the

Secretary may "have as a condition" or "stipulate" that the price to be paid will include a rebate or

discount. 42 U.S.C. § 256b(a)(1); Provide, Merriam-Webster.com. In other words, in instances

where the Secretary is providing "any rebate or discount," the Secretary has discretion to determine

whether the manufacturer can sell the drugs to the covered entity at the ceiling price by way of an

upfront discount or a rebate.

Plaintiff posits that the phrase "as provided by the Secretary" modifies not only the terms

"rebate or discount," but the entire clause "taking into account any rebate or discount." Pl. Mot.

at 29-30 (ECF No. 27). Even if Plaintiff is correct, the statute would not take on Plaintiff's

preferred meaning.  The phrase "taking into account any rebate or discount, as provided by the Secretary" means that the "amount required to be paid" (i.e., paid by the covered entity) should factor in any rebate or discount that the Secretary stipulates or provides not that manufacturers are free to choose between discounts or rebates.  42 U.S.C. § 256b(a)(1).

To be sure, Congress did not mandate that the manufacturers effectuate the price reductions though upfront discounts, but Congress also did not contemplate a regime where a manufacturer would choose its method for offering 340B price reductions.  Such an interpretation would render the phrase "as provided by the Secretary" inoperative and superfluous.  Under Plaintiff's reading, "as provided by the Secretary" would become "as provided by the manufacturer," or would be deleted altogether.  Under the "canon against surplusage," a Court should strive to give effect "'to all [statutory] provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Cares Cmty. Health v. Health and Human Serv.*, 944 F.3d 950, 960-61 (D.C. Cir. 2019) *(quoting, Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018)).  Because Defendants have offered "[an] interpretation that gives effect to every clause and word of the statute," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013), the Court should find that it is the correct reading of the statute.

Plaintiff's argument that its interpretation of the statute is consistent with "background contract principles" lacks merit for similar reasons.  Pl. Mot at 31-32.  Even if the "price" in a generic sales contract includes a rebate or credit, this fails to account for the statute's instruction that "the amount required to be paid" "tak[es] into account any rebate or discount, as provided by the Secretary."  42 U.S.C. § 256b(a)(1).  If Congress intended for the manufacturer to be able to offer the ceiling price through any mechanism that the manufacturer choose, then there would have been no need to specify that the price reduction should "take into account any rebate or discount as provided by the Secretary."

The D.C. Circuit's recent ruling in *Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452 (D.C. Cir. 2024) does not contradict Defendants' interpretation.  *Contra*, Pl. Mot at 26 (ECF No. 27). Although *Novartis Pharms. Corp.,* 102 F.4th at 459, concerned the same statutory provision at issue in this case, 42 U.S.C. § 256b(a)(1), that ruling turned on a different sentence in that provision and thus provides no insights on whether Secretarial approval is required before a manufacturer can implement a credit or rebate model.  Specifically, the question in *Novartis Pharms. Corp.* 102 F.4th at 459, was "whether drug manufacturers may impose contractual conditions on how their products are distributed to covered entities."  The manufacturers sought "to limit the number and kinds of contract pharmacies to which they would ship orders."  *Id*. at 458.  But the Agency disallowed this practice, advising the manufacturers that the manufacturers needed to "deliver covered drugs to any contract pharmacies with which a covered entity chooses to partner."  *Id.* The statute directs the Secretary to "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."  42 U.S.C. § 256b(a)(1). The Agency reasoned that a manufacturer that limited the terms of delivery was in violation of the statute because the manufacturer's "statutory duty to offer drugs to covered entities at or below the ceiling price 'is not qualified, restricted, or dependent on how the covered entity chooses to distribute the covered outpatient drugs.'"  *Novartis Pharms. Corp.* 102 F.4th at 458.

The *Novartis* Court ruled that the manufacturers had discretion to impose certain conditions on delivery because the statute "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount[;]" the statute is otherwise silent on conditions of delivery and "statutory silence implies that private parties may act freely.*"  Id.* at 460 (*citing Christensen v. Harris County*, 529 U.S. 576, 588 (2000)).  In contrast, the portion of the statute at issue here is not silent.  The statute specifically provides that the amount that the

covered entity is required to pay takes "into account any rebate or discount, as provided by the Secretary[,]" 42 U.S.C. § 256b(a)(1), allowing the Secretary to decide whether to provide for the reduced price through a rebate or upfront discount.

Plaintiff argues that any restriction on the selection of a rebate or discount must be contained within the pharmaceutical pricing agreement. Pl Mot at 30-31 (ECF No. 27).  Plaintiff is incorrect.  The pricing agreement is not a regulatory vehicle or bargained for contract, rather the pricing agreement is a uniform agreement that "recite[s] the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary."  *Astra USA Inc*., 563 U.S. at 113.  As manufacturers, Plaintiffs are required to sign the pricing agreement to participate in the 340B Program.  58 Fed. Reg. 27,289, 27,291 (May 7, 1993); *see also, Astra USA Inc*., 563 U.S. at 113 (pricing agreements "are not transactional, bargained-for contracts").  Because the Agency's authority to determine whether price reductions are offered through upfront discounts or rebates is found within the text of the statute, and the pricing agreement merely recites the respective responsibilities of the Secretary and the manufacturer specified in the statute, an amendment to the pricing agreement is not required for the Agency to deny (or approve) Plaintiffs' requests to implement unapproved rebate models.  AR 425.

Additionally, not only does the natural reading of the statute supports the Agency's position that a manufacturer cannot unilaterally dictate how 340B price reductions are effectuated, but also "[w]hat legislative history there is reinforces the text."  *Fed. Educ. Ass'n Stateside Region v. FLRA,* 104 F.4th 275, 284 (D.C. Cir. 2024).  Specifically, the report from the House Energy and Commerce Committee explains that "Federal Medicaid matching funds would not be available for State spending on any of a manufacturer's covered outpatient prescription drugs unless the "manufacturer enters into, and complies with, an agreement with the Secretary" under which

covered entities "would pay the same amount for a covered outpatient drug that Medicaid pays."
H.R. Rep. No. 102-384, pt. 2, at 8 (1992).  The price reductions "would be at least as great as those
which Medicaid receives under the rebate program," and "would be implemented, at the discretion
of the Secretary, either by a point-of-purchase discount, a rebate, or other mechanism."  *Id.* at 12.
Notably, the report specifies that "the Secretary would have the discretion to determine the
mechanism (rebate, point-of-purchase discount, or otherwise) for assuring this price reduction."
*Id.*  Although the legislation "does not specify whether 'covered entities' would receive these
favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through
some other mechanism," Congress expected that the Secretary "will use the mechanism that is the
most effective and most efficient from the standpoint of each type of 'covered entity.'"  *Id.* at 16.
Nowhere does the report suggest that the manufacturer can unilaterally decide how to effectuate
price reductions.  *Id.*

Echoing the text and the legislative history the Agency has long advised manufacturers,
covered entities, and other 340B Program stakeholders that the Secretary has the authority to
determine the mechanism that is "most effective and most efficient."  62 Fed. Reg. 45,823, 45,824
(Aug. 29, 1997) (citing H.R. Rep. No. 102-384, pt. 2, at 16).  The appropriate mechanism will vary
depending on the needs of the covered entity.  62 Fed. Reg. at 45,824.  "A mechanism that is
appropriate to one type of 'covered entity,' such as community health centers, may not be
appropriate to another type[.]"  *Id.*  Moreover, the Agency has long envisioned upfront discounts
as the preferred price reduction mechanism, because "[c]overed entities generally preferred a
discount system, because they could negotiate lower prices and needed less initial outlay of drug
purchasing money."  *Id.*

The Agency maintained this position when it recognized manufacturers' ability to effectuate price reductions through rebates to AIDS drug assistance programs. The Agency sought "comments on the proposal of a rebate option for State AIDS Drug Assistance Programs." 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997). Both the manufacturers and the AIDS drug assistance programs submitted comments to the Agency supporting the rebate option, 63 Fed. Reg. 35,239, 35,240 (Jun. 29, 1998), and the Agency never disclaimed its authority to block the rebate system if it did not conclude that rebates were an appropriate mechanism to effectuate discounts for AIDS Drug Assistance Programs. 62 Fed. Reg. at 45,824. One commenter wrote that their "(favorable) response to the recognition of a rebate program for the [AIDS Drug Assistance Programs] would be different if [the Agency] proposed a rebate program for all covered entities." 63 Fed. Reg. 35,241-42. The commenter "urge[ed] that the rebate mechanism be an option only for meeting the unique needs of the [AIDS Drug Assistance Programs] and that [the Agency] not consider any further expansion to other categories of entities." *Id.* at 35,241. The Agency responded, "[a]t this time, we agree. This notice only recognizes a rebate option for [AIDS Drug Assistance Programs] that receive assistance under Title XXVI of the Public Health Service Act." *Id.* at 35,242. Since then, the Agency has not recognized a rebate option for any other type of covered entity, or even solicited public comments on a proposal to expand the rebate model to other covered entities.

Plaintiff's reference to 42 C.F.R. § 10.10(c) does not support their assertion that the 340B statute allows them to unilaterally implement a credit model either. 42 C.F.R. § 10.10(c) concerns newly-offered 340B drugs. The regulation provides that "a manufacturer must estimate the 340B ceiling price for a new covered outpatient drug as of the date the drug is first available for sale." *Id*. But this is temporary until an average manufacturer price "is available, which should occur no later than the [fourth] quarter that the drug is available for sale." *Id*. After the average

manufacturer price is available, the manufacturer must calculate the 340B ceiling price by subtracting the "unit rebate amount" from the "average manufacturer price." *Id.* § 10.10(a), (c). After making this calculation, manufacturers must "offer to refund or credit the covered entity the difference between the estimated 340B ceiling price and the actual 340B ceiling price within 120 days of the determination by the manufacturer that an overcharge occurred." *Id.* § 10.10(c). In short, the "refund or credit" described in this regulation exists solely for the purpose of compensating a covered entity that purchases a newly available drug above the 340B ceiling price because the manufacturer overestimated the 340B ceiling price. *Id.* Here, Plaintiff's credit model is not for newly available drugs and Plaintiff's reference to 42 C.F.R. § 10.10(c) is therefore inapplicable.

Accordingly, the Court should find that the Agency's decision to block Plaintiff from implementing a credit model without Secretarial approval is consistent with the text of the statute and thus not contrary to law.

## II.    The Agency Decision to Prohibit Plaintiff from Instituting an Unapproved Credit Model was Not Arbitrary and Capricious.

The Agency's decision to deny Plaintiff's requests to implement an unapproved credit model was not arbitrary and capricious or an abuse of discretion. 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). Under the APA, an agency action may be arbitrary and capricious if the agency explained its decision in a way that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or agency expertise. *Escobedo v. Green*, 602 F. Supp. 2d 244, 248 (D.D.C 2009) (citing *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "As the Supreme Court has explained, 'the scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency.'" *Id.*

Although the court's review under the "arbitrary and capricious" standard is "searching and careful," it is also "narrow." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989); *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The ultimate question under this narrow standard of review is whether the agency's action was reasonable. *Fed. Commc'n Comm'n v. Fox Television Stations*, 556 U.S. 502, 514-15 (2009).

Here, the Agency acted reasonably when it declined to allow Plaintiff to unilaterally implement an unapproved credit model for two reasons. First, the credit model would change the way the 340B program has operated for the last thirty years by ceasing to offer direct upfront discounts. Second, the credit model that Plaintiff proposed would shift responsibility for monitoring compliance with the duplicate discount and diversion prohibitions from the Agency to the manufacturer.

### A. The Agency's Decision Preserves the 340B Program as It has Operated for Over Thirty Years.

The Secretary has not "provided" that the credits that Plaintiff proposed using should be "tak[en] into account in the "amount required to be paid." AR 425 (quoting 42 U.S.C. § 256b(a)(1)). As a result, Plaintiff would be violating 42 U.S.C. § 256b(a)(1) if it began requiring covered entities to place orders for 340B eligible drugs at the market rate and then seek a credit from Plaintiff after the covered entity dispenses the drug to an eligible patient. AR 424. Moreover, although the Agency has never stated that credits would not be approved under any circumstances, the Agency has long envisioned upfront discounts as the preferred price reduction mechanism, because "[c]overed entities generally preferred a discount system, because they could negotiate lower prices and needed less initial outlay of drug purchasing money." 62 Fed. Reg. at 45,824.

Although the statute does not prohibit credit models in the abstract, it does prohibit instituting unapproved credit models unilaterally. 42 U.S.C. § 256b(a)(1). In communications

with the Agency, Plaintiff maintained that it could implement the credit model without approval from the Agency. AR 348. In response, the Agency advised Plaintiffs that that the Secretary had not "provided for" the credits that Plaintiff proposed "to date." AR 380. The Agency never said the credits would never be approved.

Plaintiff argues that the Agency is affording it less favorable treatment than it afforded the rebate model that it authorized for AIDS Drug Assistance Programs. Pl. Mot at 35. This argument lacks merit. The Agency determined that rebates were an appropriate mechanism to effectuate price reductions for AIDS Drug Assistance Programs because many AIDS Drug Assistance Programs used purchasing systems that made it difficult for them to access reduced cost drugs through direct discounts. 63 Fed. Reg. at 35,240. Plaintiffs here have not asserted that the covered entities that they sell their products to have similar issues with their purchasing systems. *See, generally*, Pl. Mot. This makes the credit models that Plaintiffs seek to impose materially different from the rebate models that the Agency permitted for AIDS Drug Assistance Programs.

Plaintiff argues that the Agency's decision is arbitrary and capricious because the proposed credit model is similar to the "replenishment model" that is widely used to facilitate 340B transactions currently without any objection from the Agency. Pl. Mot. at 34-36. But in correspondence with other manufacturers the Agency identified meaningful distinctions between the two models. AR 203. Plaintiff's characterization of the product replenishment model as "a type of rebate model" is, at best, misleading. Pl. Mot. at 35-36. Under the product replenishment model, a covered entity makes an initial purchase of drugs at the wholesale acquisition cost. AR 203. The covered entity then dispenses those drugs to both 340B-eligible and non-eligible patients. AR 060. A third-party administrator or other entity evaluates the claims data to determine how many units of a drug were dispensed to a 340B eligible patient. *Id.* Once the covered entity has

dispensed enough 340B eligible units of a particular drug to equal that drug's "package size," the covered entity purchases a package of those drugs from the manufacturer at the 340B discount price. *Id.* In other words, the covered entity "replenishes" its stock of a particular drug at the 340B discount price.

The Agency identified key distinctions between the two models. AR 203. Most glaringly, under the product replenishment model, the covered entity only pays the wholesale price for its initial purchase and then makes its subsequent, i.e. "replenishment purchases" at the 340B price. *Id.* Thus, under the replenishment model, the manufacturer provides an upfront discount for every purchase except for the initial purchase. *Id.* But under Plaintiff's proposed credit model, the covered entity would need to place an order for drugs at the wholesale price, AR 350, and then, within thirty days of dispensing the drug, submit "purchase and claims data" to Plaintiff in order to obtain a credit. AR 410. Plaintiff claims that it will issue the credits within thirty days of the covered entity's order, which "under commercially prevalent terms" would occur before the covered entity's payment to the wholesaler is due. AR 350. Additionally, to obtain the credit, hospital covered entities need to submit healthcare encounter data to establish that the drug dispensed was dispensed to a patient who was eligible to receive drugs at the 340B price. AR 411-12. This is an added step that covered entities are not required to take in order to obtain 340B drugs through upfront discounts. AR 425.

In other words, under the product replenishment model, the covered entities receive upfront discounts for all purchases except for the initial purchase, but under the credit model, upfront discounts would be nonexistent and the covered entity would be at the mercy of the manufacturer to ensure that the credit is paid before the covered entity needs to pay the wholesaler for the market price. *Id.* Plaintiff has not even guaranteed that it will be able to pay the credit before the covered

entity needs to pay the wholesaler, noting that the covered entity would receive the payment "before the wholesaler's bill becomes due under commercially prevalent terms." AR 410. Tellingly, if Plaintiff was correct that the credit model "will function in a similar way" to the replenishment model, Plaintiff would not be seeking the Court's intervention to allow them to replace the product replenishment model with a new mechanism to effectuate 340B pricing. Pl. Mot at 34.

Moreover, the covered entities voluntarily chose to receive discounts through the product replenishment process. AR 203. In contrast, Plaintiff seeks to impose its credit model on the covered entities regardless of whether the covered entities believe that cash rebates are the optimal mechanism to receive 340B discounts. See AR 408-412.

Plaintiff advances a multitude of policy arguments extoling the benefits of their rebate models and argue that the Agency has not considered "all aspects of the problem." Pl. Mot at 36-41. (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). But crucially, Plaintiff is one of seven drug manufacturers that proposes implementing a variation of a rebate or credit model. The Agency advised Plaintiff that it "continues to be in the process of reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program," but that "implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1) of the Public Health Service Act." AR 406.

Except for AIDS Drug Assistance Programs, 340B price reductions have been effectuated through upfront discounts for the thirty-three years that the program has operated. 63 Fed. Reg. 35,241-42. For this reason, widespread adoption of rebate or credit models would cause unprecedented disruption to the program. See e.g., AR 406, 565-69. Given the potential disruption, the Agency is justified in conducting a searching inquiry and taking a measured

approach to these rebate requests.  Plaintiff first contacted the Agency on November 1, 2024, and filed suit just six weeks later.  AR 348.  As an added wrinkle, Plaintiff's communications with the Agency and subsequent lawsuit coincided with a transition of Administration.  The Agency's obligation to consider "all aspects of the problem," includes considering not just the manufacturers' preferences and bottom line, but also how the changes would affect the operations of covered entities and the wellbeing of patients who rely on 340B drugs.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Plaintiffs have not allowed the Agency the opportunity to evaluate these issues to reach a final decision as to whether the proposed rebate models are consistent with the 340B statute.

> **B.**    **Plaintiff's Proposed Credit Model Would Shift Responsibility for Monitoring 340B Transactions for Duplicate Discount and Diversion Violations from the Agency to the Manufacturers.**

Not only does Plaintiff's proposal seek to change the way that it effectuates 340B price reductions, the proposal, if implemented, would shift responsibility for ensuring that covered entities do not engage in diversion and duplicate discount violations from the Agency to Plaintiff as a manufacturer.  AR 351 ("Patient Eligibility Condition").  Specifically, Plaintiff proposes requiring hospital covered entities to submit data about patients including the billing service provider ID, the Date of Service, the rendering physician ID, the healthcare service provider code, the diagnosis code, and the place of service code along with the hospitals' requirement for a credit.  AR 423.  Plaintiff would then use this information to verify that the individual is a patient of the covered entity under the Agency's guidance.  AR 411-12 (citing 61 Fed. Reg. 65,406 (Dec. 12, 1996)).  Plaintiff argues it needs to implement this system to guard against prohibited diversion and duplicate discounts.  Pl. Mot. at 38.  But the 340B statute and the Agency's guidance already provides for safeguards to prevent diversion and duplicate discounts.

Covered entities are barred from obtaining a price reduction under both Medicaid and the 340B Program.  42 U.S.C. § 256b(a)(5)(A).  If a manufacturer has "reasonable cause" to believe that a particular covered entity is taking duplicative discounts, then the manufacturer may audit "the records of the entity that directly pertain to the entity's compliance with" the prohibitions on diversion and duplicate discounts "with respect to drugs of the manufacturer," so long as the manufacturer "act[s] in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits."  *Id.*  To initiate an audit, the manufacturer must submit an audit workplan to the Agency and, if the Agency determines that reasonable cause for the audit exists, "the Department will not intervene" in the manufacturer's audit of the covered entity.  61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

A manufacturer can establish reasonable cause to audit a covered entity for violations of the prohibition of duplicate discounts or diversion by showing "significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity."  61 Fed. Reg. 65,406.  Even under the product replenishment model, a manufacturer can track which covered entities are purchasing their drugs and the quantities of those purchases.  If Plaintiff has reasonable cause to believe that a covered entity is taking duplicative discounts, then Plaintiff can present an audit workplan to the Agency and audit that covered entity's compliance with the duplicate discount prohibition.  42 U.S.C. § 256b(a)(5)(A) & (C).

After an audit is complete, the auditors prepare an audit report, which is provided to the Agency and the covered entity.  *Id.*  The covered entity has thirty days to provide its response to the report's findings and recommendations, including any planned actions to address the findings. *Id*.  The Agency may then take enforcement action against the covered entity, which can include

ordering the covered entity to repay the manufacturer for the amount of price reduction that the covered entity received in connection with the diversion or duplicate discount, 42 U.S.C. § 256b(a)(5)(D), (d)(2)(B)(v)(I), or, in some circumstances, terminate the covered entity from the 340B Program. *Id.* § 256b(d)(2)(B)(v)(II). Any enforcement action would depend on the audit's findings, the covered entity's response, as well as the agency's final determination on the matter, which could include adjudication of the dispute through a 340B Administrative Dispute Resolution process initiated by the manufacturer. *Id.* § 256(d)(3).

Under current practice, the Agency acts as an arbiter between the covered entity and the manufacturer because the Agency has the authority to determine whether a manufacturer audit can proceed. 61 Fed. Reg. at 65,410. As part of its review of the audit workplan, the Agency will determine whether the manufacturer has established reasonable cause that the covered entity is diverting 340B drugs to ineligible patients or taking duplicative discounts on the same unit of drug. *Id.* And as the manufacturer conducts the audit, the manufacturer must continue to sell 340B drugs to the covered entity below the ceiling price. *Id.* Under Plaintiff's proposal, Plaintiff would shift the burden to the covered entities to convince Plaintiff that each dispensed 340B drug was dispensed to a 340B eligible patient regardless of whether Plaintiff has reasonable cause to believe that a covered entity is misusing the program. AR 411-12. Plaintiff even concedes that it would assume the task to "enforce" the Agency's patient definition. Pl. Mot. at 42. Thus, Plaintiff intends to use its own evaluation of the data that covered entities submit as part of their claims to determine whether the recipient is an eligible patient. AR 411.

In essence, Plaintiff intends to audit each individual claim for a 340B discount and if Plaintiff is not satisfied with the data that the covered entity submits, then Plaintiff will not pay the credit to the covered entity. See AR 411, 425. Like the credit model itself, Plaintiff's proposal to

collect claims data to continuously monitor covered entities' compliance with their obligations under the 340B Program in order to approve a credit is a change to how the 340B program has operated for more than thirty years. The Agency must consider how this change would affect covered entities and their patients in order to consider "all aspects of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Under APA review, the question for this Court is whether the agency adequately explained its decision or if the decision "may be reasonably discerned." *Bowman Transp., Inc. v. Ak.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 557 (D.C. Cir. 2022) ("We will uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned."); *see also CSL Plasma Inc. v. Customs & Border Prot.*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022) ("[A] brief explanation is not arbitrary and capricious just because of its brevity."). The Agency has never previously recognized a system where manufacturers offer credits to covered entities based on the manufacturer's own verification that the drug was dispensed to a 340B eligible patient. AR 425. Ensuring such a system is workable for all stakeholders requires further review by the Agency. AR 406. Accordingly, the Agency's decision to prevent Plaintiff from unilaterally implementing the credit model "at this time" was not arbitrary and capricious.

\*    \*    \*

## CONCLUSION

For these reasons, the Court should grant summary judgment in Defendant's favor and deny Plaintiff's motion for summary judgment.

Dated: March 27, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _____*/s/ John J. Bardo*_____
JOHN J. BARDO, D.C. Bar #1655534
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 870-6770

*Attorneys for the United States of America*