## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANOFI-AVENTIS U.S. LLC,

*Plaintiff*,

*v.*

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services,

HEALTH RESOURCES AND SERVICES
ADMINISTRATION,

THOMAS J. ENGELS, in his official capacity
as Administrator of the Health Resources and
Services Administration,

*Defendants*.

Case No. 24-cv-3496 (DLF)

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY
## <u>IN SUPPORT OF SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.    HRSA Erred in Concluding That Section 340B Requires the Agency to Preapprove the Use of Credits. ................................................................. 3

    A.    The Government Now Agrees That Section 340B Permits the Use of Credits. ....................................................................................... 3

    B.    Section 340B Does Not Require HRSA to Preapprove the Use of Credits. ........................................................................................... 4

        1.    The Statutory Text Does Not Suggest a Preapproval Regime. ........................................................................... 4

        2.    Statutory Structure and Context Do Not Suggest a Preapproval Regime. ................................................................. 5

        3.    Historical Practice Reflects No Preapproval Regime. .................. 7

    C.    HRSA's Rejection of Sanofi's Credit Model Is Also Arbitrary and Capricious. ................................................................................. 9

II.    HRSA Erred in Concluding That Sanofi Could Not Impose a Patient Eligibility Condition. .............................................................................. 14

    A.    The Government Does Not Dispute That Section 340B Permits Sanofi's Patient Eligibility Condition. ..................................................... 15

    B.    HRSA Did Not Provide a Reasoned Explanation for Objecting to Sanofi's Patient Eligibility Condition. ..................................................... 18

CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amalgamated Transit Union v. Skinner*,
   894 F.2d 1362 (D.C. Cir. 1990) ..................................................................6, 9

*Astra USA, Inc. v. Santa Clara Cnty.*,
   563 U.S. 110 (2011).................................................................................7, 18

*Borden v. eFinancial, LLC*,
   53 F.4th 1230 (9th Cir. 2022) .........................................................................5

*Children's Nat'l Med. Ctr. v. Engels*,
   24-CV-2563 (RC) (D.D.C. filed Sept. 6, 2024)...........................................20

*Commc'ns & Control, Inc. v. FCC*,
   374 F.3d 1329 (D.C. Cir. 2004) .......................................................................9

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
   583 U.S. 416 (2018).........................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020).....................................................................................10, 19

*Dubin v. United States*,
   599 U.S. 110 (2023).........................................................................................6

*El Rio Santa Cruz N'hd Health Ctr., Inc. v. U.S. Dep't of Health & Hum Servs.*,
   396 F.3d 1265 (D.C. Cir. 2005) ................................................................10, 14

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018).........................................................................................8

*Food & Water Watch v. FERC*,
   28 F.4th 277 (D.C. Cir. 2022) ........................................................................16

*Gadelhak v. AT&T Servs., Inc.*,
   950 F.3d 458 (7th Cir. 2020)  .........................................................................5

*Gandhi v. Ctrs. for Medicare & Medicaid Servs.*,
   665 F. Supp. 3d 49 (D.D.C. 2023) .................................................................15

*Grayscale Invs., LLC v. SEC*,
   82 F.4th 1239 (D.C. Cir. 2023) ...................................................................................10

*Indep. Petrol. Ass'n of Am. v. Babbit*,
   92 F.3d 1248 (D.C. Cir. 1996) ....................................................................................12

*Int'l Dark-Sky Ass'n, Inc. v. FCC*,
   106 F.4th 1206 (D.C. Cir. 2024) .................................................................................15

*MaineGeneral Med. Ctr. v. Engels*,
   24-CV-2187 (RC) (D.D.C. filed July 24, 2024) .........................................................20

*Marcum v. Salazar*,
   694 F.3d 123 (D.C. Cir. 2012) ....................................................................................19

*Michigan v. EPA*,
   576 U.S. 743 (2015) .....................................................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...........................................................................................11, 12, 13

*New England Power Generators Ass'n, Inc. v. FERC*,
   881 F.3d 202 (D.C. Cir. 2018) ....................................................................................21

*Novartis Pharms. Corp. v. Espinosa*,
   No. 21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) ..............................2, 8

*Novartis Pharms. Corp. v. Johnson*,
   102 F.4th 452 (D.C. Cir. 2024) ........................................................................ *passim*

*Oregon Health & Sci. Univ. v. Engels*,
   24-CV-2184 (RC) (D.D.C. filed July 24, 2024) .........................................................20

*Pol'y & Rsch., LLC v. HHS*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................................9

*Prill v. NLRB*,
   755 F.2d 941 (D.C. Cir. 1985) ....................................................................................18

*Rodriguez v. United States*,
   480 U.S. 522 (1987) .....................................................................................................14

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*,
   58 F.4th 696 (3d Cir. 2023) ...................................................................................16, 20

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943) ................................................................................................10, 16, 19

*Sorenson Commc'ns Inc. v. FCC*,
 755 F.3d 702 (D.C. Cir. 2014) ..............................................................................................12

*United States v. Dale*,
 991 F.2d 819 (D.C. Cir. 1993) ................................................................................................5

*University of Kan. Hosp. Auth. v. Kennedy*,
 No. 25-CV-549 (RC) (D.D.C. filed Feb. 24, 2025) ...............................................................20

*University of Rochester v. Engels*,
 24-CV-2268 (RC) (D.D.C. filed Aug. 1, 2024) ....................................................................20

*University of Wash. Med. Ctr. v. Kennedy*,
 No. 24-CV-2998 (RC) (D.D.C. filed Oct. 22, 2024) .............................................................20

*Water Quality Ins. Syndicate v. United States*,
 522 F. Supp. 2d 220 (D.D.C. 2007) .......................................................................................10

**STATUTES**

42 U.S.C. § 256b ................................................................................................................. *passim*

**OTHER AUTHORITIES**

58 Fed. Reg. 27,289 (May 7, 1993) ...............................................................................................8

61 Fed. Reg. 65,406 (Dec. 12, 1996) ...........................................................................................18

62 Fed. Reg. 45,823 (Aug. 29, 1997) .............................................................................................8

63 Fed. Reg. 35,239 (June 29, 1998) .............................................................................................8

H.R. Rep. 102-384 .........................................................................................................................9

## INTRODUCTION

The government finally agrees with Sanofi that Section 340B does not prohibit manufacturers from using credits to effectuate 340B pricing or from confirming that their drugs are provided to a covered entity's patients. *See* Dkt. 41 ("Opp.") 9 ("To be sure, Congress did not mandate that the manufacturers effectuate the price reductions though [sic] upfront discounts."); *id.* at 15 ("the statute does not prohibit credit models in the abstract"); *id.* at 21–22 (arguing only that the patient eligibility condition "is a change to how the 340B program has operated" but not disputing its statutory validity). So there is no longer any dispute that Sanofi's Credit Model— which is designed to reduce widespread abuse of the 340B Program without compromising covered entities' ability to buy drugs at reduced prices—is permitted by Section 340B, notwithstanding HRSA's contrary conclusion last year.

Instead, the government argues that Section 340B required Sanofi to win HRSA's preapproval before launching its Credit Model. But the government identifies no statutory basis for this requirement, which HRSA has never previously imposed. Rather, the government clings to a statutory phrase that simply authorizes HRSA to address the use of discounts and rebates in the Pharmaceutical Pricing Agreements ("PPAs") that govern each manufacturer's participation in the 340B Program. The statutory text, structure, and context, as well as decades of historical practice, all cut against the government's sudden claim of an expansive and novel preapproval power for HRSA. This Court should reject that statutory interpretation out of hand.

Moreover, even if Section 340B did somehow create a preclearance regime (and nobody realized for all these years), HRSA still needed to offer a reasonable and reasonably explained rejection of Sanofi's Credit Model. It did neither. Instead, its proffered rationales were that the statute (1) prohibits rebates (now a conceded error) and (2) requires the Secretary's preapproval— which is circular, because the need for preapproval cannot be a basis for rejecting a proposal. The

agency did not consider any of the arguments Sanofi raised as to why its Credit Model is not only lawful but will in fact improve the 340B Program's operations.  For example, HRSA never reconciled its rejection of Sanofi's model with the long-accepted use of rebates for AIDS Drug Assistance Programs ("ADAPs").  Nor did HRSA address, let alone dispute, how Sanofi's model will help combat the rampant fraud and waste that has been documented in the 340B Program.  While the government tries to dispute these points now, its attempts to backfill HRSA's decision with *post hoc* explanations are inappropriate, and in any event they lack merit.

Nor can the government defend HRSA's rejection of Sanofi's patient eligibility condition.  While HRSA determined that this condition violated Section 340B, the government now abandons that view and instead argues that HRSA just needed more time to assess what would be good policy.  But that is squarely at odds with HRSA's Violation Letter, which definitively rejected Sanofi's model.  The government's position also rests on a fundamental misunderstanding:  This condition is designed to prevent unlawful diversion *before* it occurs, which is entirely consistent with Section 340B's procedures for addressing diversion after the fact.  The mere existence of *post hoc* clawback remedies does not imply that parties are powerless to keep violations from occurring in the first place—particularly given the burdens and limitations of those back-end remedies, which are currently ineffective as a result.  And the government simply ignores that Sanofi's proposal would help combat the widespread diversion that now pervades the 340B Program.

Once again, HRSA has erred by imposing limits on manufacturers' implementation of the 340B Program that are nowhere to be found in the statute. *See Novartis Pharms. Corp. v. Espinosa,* No. 21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) (Friedrich, J.), *aff'd sub nom. Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024).  The Court should grant Sanofi's motion for summary judgment and deny the government's cross-motion.

## ARGUMENT

Two core issues remain, in light of the government's concessions that Section 340B permits both (1) using credits to effectuate the 340B price and (2) ensuring that drugs are going to a covered entity's patient before providing the 340B credit.  First is whether HRSA misunderstood Section 340B to require agency preapproval before Sanofi uses a credit to effectuate the 340B price.  And second is whether HRSA acted improperly in rejecting the two components of Sanofi's Credit Model.  On both points, the answer is yes.  The Court should thus hold the Violation Letter unlawful and set it aside; declare that Sanofi's Credit Model complies with Section 340B; and enjoin the defendants from taking enforcement action against Sanofi based on the Credit Model.

**I.  HRSA Erred in Concluding That Section 340B Requires the Agency to Preapprove the Use of Credits.**

**A.  The Government Now Agrees That Section 340B Permits the Use of Credits.**

Although HRSA issued the Violation Letter due in part to its conclusion that Section 340B prohibits the use of credits or rebates, *see* AR 425, the government now concedes that "Congress did not mandate that [Sanofi] effectuate price reductions though [sic] upfront discounts," Opp. 9. Sanofi appreciates the government's candor.

As the opening brief explained, Section 340B "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount."  *Novartis*, 102 F.4th at 460.  And the statute repeatedly contemplates that this price is inclusive of "rebates."  *See, e.g.*, 42 U.S.C. § 256b(a)(1) (noting that the discounted price must "tak[e] into account any rebate or discount, as provided by the Secretary"), (a)(2) (repeatedly labeling the difference between average price and the discounted price as the "rebate percentage"), (a)(5)(A) (provisions for "[p]rohibiting duplicate discounts or rebates"), (d)(1)(B)(iv) (directing the Secretary to develop a mechanism for reporting "rebates and other discounts" that manufacturers provide under the

section); *see also* Dkt. 27 ("Sanofi Opening Br.") 18–19. This congressional choice is not surprising. As Sanofi also explained, black-letter contract law recognizes that a sale "price" includes rebates, an intuitive fact that HRSA itself has previously recognized. Sanofi Opening Br. 23–26. So the question of whether Section 340B permits the use of credits or rebates to effectuate the 340B price need not detain this Court long.[1]

### B.    Section 340B Does Not Require HRSA to Preapprove the Use of Credits.

Having agreed that Section 340B allows rebates, the government instead argues that Section 340B prohibits Sanofi from implementing its Credit Model without the Secretary's preapproval. *See* AR 424–25. The government derives this supposed preapproval authority from a parenthetical reference to rebates in Section 340B, which details the Secretary's obligation to "enter into an agreement with each manufacturer … under which the amount required to be paid (taking into account any rebate or discount, *as provided by the Secretary*)" does not exceed a ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). But nothing about this parenthetical imposes a requirement for manufacturers to submit "requests to implement … rebate models" for the Secretary's preapproval, as the government now argues. Opp. 11.

### 1.    The Statutory Text Does Not Suggest a Preapproval Regime.

As the opening brief explained, Congress knows how to require agency preapproval—and it generally does not do so with the phrase "as provided by." *See* Sanofi Opening Br. 20–21. The government offers no answer to this point, nor any example of Congress otherwise using "as provided by" to enshrine a preapproval regime. Instead, as Sanofi explained, the phrase "as

---

[1] Notwithstanding the government's concession, Intervenors surprisingly argue that Section 340B *mandates* the use of upfront discounts. As explained in the joint response to Intervenors, this position—which would prohibit decades-old 340B rebate practices in other contexts—is not properly before the Court and, in any event, is wrong on the merits. *See* Dkt. 44 (Pls.' Joint Response to Intervenors) 3–17; Sanofi Opening Br. 18–19.

provided by" signals agency authority over *how* something is done.  And the government's observations that the statute uses "the past tense of 'provide,'" and that "provide" can mean "stipulate," are beside the point, because they do not answer the question of *what* the agency's authority concerns.  Opp. 8.

Here, that authority concerns how "the amount required to be paid" for the manufacturer's drugs must "*tak[e] into account* any rebate or discount"—which is the whole phrase that precedes the "as provided by" clause.  42 U.S.C. § 256b(a)(1) (emphasis added); *see* Sanofi Opening Br. 21–22.  "When interpreting a modifying clause set off by commas, 'the most natural way to view the modifier is as applying to the entire preceding clause.'"  *Borden v. eFinancial, LLC*, 53 F.4th 1230, 1233 (9th Cir. 2022) (quoting *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 439–40 (2018)); *see also, e.g.*, *United States v. Dale*, 991 F.2d 819, 847 (D.C. Cir. 1993) (similar); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 464 (7th Cir. 2020) (Barrett, J.) (similar).  The Secretary's authority over the "account[ing]" of "any rebate or discount," § 256b(a)(1), does not suggest that all "rebate[s] or discount[s]" must be approved by the Secretary before being launched.

Nor is a preapproval requirement the only way to give meaning to the "as provided by" language, as the Government argues.  Opp. 9.  Instead, as explained, that language is naturally read to give the Secretary limited authority over how "any rebate or discount" is implemented—without making the Secretary a gatekeeper before "any rebate or discount" can take effect.

### 2. Statutory Structure and Context Do Not Suggest a Preapproval Regime.

Nor can the government's position be squared with the rest of Section 340B, which is otherwise entirely silent about this purported preapproval regime—in stark contrast to the statute's provisions that specifically direct the Secretary to develop rules and/or systems for verifying

ceiling prices, hearing disputes between manufacturers and covered entities, auditing manufacturers and wholesalers, imposing civil monetary penalties, and more. *See, e.g.*, 42 U.S.C. § 256b(d)(3). The government's attempt to conjure a preapproval requirement thus seeks an end-run around the statute's carefully calibrated regime. *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) (explaining that "[w]here Congress prescribes the form in which an agency may exercise its authority," courts must hew to "that prescribed form"); *Novartis*, 102 F.4th at 456 (the "Secretary lacks rulemaking authority over the section 340B program").

Indeed, Section 340B forecloses the notion of some freestanding preapproval authority over "any rebate or discount" by making clear that the Secretary's authority on that issue must be exercised within the PPA. As the opening brief discussed, the "as provided by" language is nested within the Secretary's obligation to "enter into an agreement with each [covered] manufacturer … *under which* the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary)" does not exceed a ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). That "agreement"—the PPA—is thus the vehicle "under which the amount required to be paid" accounts for "any rebate or discount, as provided by the Secretary." *Id.* In other words, this provision authorizes the Secretary to regulate the implementation of rebates and discounts, if at all, under the "agreement" that it describes. Sanofi Opening Br. 22–23. But, as the government does not dispute, Sanofi's PPA is entirely silent on this issue.

Statutory context confirms this reading. To start, the provision's heading states that it addresses the "[r]equirements for agreement with Secretary." 42 U.S.C. § 256b(a); *see, e.g.*, *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (noting the longstanding rule that "the heading of a section are tools available for the resolution of a doubt about the meaning of a statute"). To that end, the provision otherwise specifies the content of a PPA, including, for example, the definition

of major terms and the calculation of the "rebate percentage" that sets the ceiling price.  *See*

§ 256b(a)(2)–(4).  And, as discussed, the statute does not vest the Secretary with general

"rulemaking authority" that can be used to implement a preapproval regime.  *Novartis*, 102 F.4th

at 456.

In response, the government argues that PPAs cannot be where the Secretary exercises

authority over rebates and discounts because PPAs can only "recite the responsibilities § 340B

imposes."  Opp. 11 (quoting *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011)).  But

*Astra* did not even purport to address the Secretary's statutory authority over rebates and discounts,

and instead held only that covered entities could not sue to enforce PPAs because the "statutory

and contractual obligations … are one and the same."  563 U.S. at 118; *see also id.* at 119 (*Astra*

complaint did not allege violation of "any independent substantive obligation arising only from

the PPAs").  And because the statute expressly mentions "taking into account any rebate or

discount, as provided by the Secretary," HRSA would hardly be coloring outside the lines by

addressing this matter in the PPA.[2]

### 3.    Historical Practice Reflects No Preapproval Regime.

Finally, the government's position finds no support in HRSA's historical practice.  As the

opening brief emphasized—and the government does not dispute—HRSA has *never* preapproved

the use of upfront discounts to provide the 340B price.  *See* Sanofi Opening Br. 22, 24–28.  This

is despite "discounts" being mentioned in the exact same statutory parenthetical as "rebates," in

the exact same manner, and having served as the primary vehicle for 340B pricing at the program's

launch.  Nor has HRSA preapproved the product-replenishment model, which has now become

---

[2] Sanofi does not agree that the PPA could categorically "deny" any ability to implement the Credit Model, as the government posits.  Opp. 11.  But that question is not presented here, where all agree that Sanofi's PPA says nothing at all about the matter.

covered entities' preferred way to obtain the 340B price. Adopting HRSA's position would thus mean that all of these methods, having never been preapproved, are unlawful. It is far more reasonable to accept that HRSA never before read Section 340B to require preclearance—until the current dispute inspired an abrupt reversal. *See Novartis*, 102 F.4th at 460–61 (holding that past agency practices "reinforce[d]" correct reading of the statute).

To be sure, the government tries to argue that it preapproved the use of rebates with ADAPs, which have long used post-purchase rebates to receive the 340B price. Opp. 13. But in fact, HRSA simply "recognize[d]" the validity of rebates with providers that already had "existing agreements" for rebates. 63 Fed. Reg. 35,239, 35,240 (June 29, 1998). The agency thus blessed this approach only *after the fact*—giving comfort to program participants that it would not seek enforcement.[3]

The government also points to stray statements in agency guidance that the Secretary "will use the mechanism that is the most effective and most efficient." 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997). But that does not reference any preapproval process or authority—which, again, HRSA has never previously exercised.

In the end, the government is left clinging to a snippet of legislative history from a committee report, which stated that the Secretary would have "discretion" to determine how pricing was implemented. Opp. 11–12. But as this Court has previously explained with Section 340B, "citation to legislative history is problematic." *Novartis*, 2021 WL 5161783, at *8 n.7; *see, e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law.").

---

[3] In a similar vein, the government claims that early agency guidance "recognized the use of discounts and allowed rebates only in" a limited context. Opp. 3 (citing 58 Fed. Reg. 27,289, 27,291–92 (May 7, 1993)). But aside from specifying that rebates would sometimes be necessary, that guidance—which mostly just restated the statutory requirements—took no position on the precise mechanism for effectuating the 340B discount, much less the existence of a preapproval requirement. *See* 58 Fed. Reg. at 27,289–93.

And, in all events, it does not support the agency's position here. Even if the Secretary has some measure of "discretion," that does not authorize the Secretary to wield that authority in any manner he wants. *See, e.g.*, *Amalgamated Transit*, 894 F.2d at 1364 (discretion to engage in case-by-case development of law did not authorize prophylactic rulemaking). Indeed, the very report cited by HRSA suggests that the pricing "mechanism" could be defined in the PPA. *See* H.R. Rep. 102-384, pt. 2, at 12 (noting that manufacturers would "enter into an agreement with the Secretary of HHS to provide price reductions (whether through a discount, rebate, or other mechanism)"). History thus does not support the agency's position on preclearance, either. The Court should thus reject that position as contrary to law.

## C.    HRSA's Rejection of Sanofi's Credit Model Is Also Arbitrary and Capricious.

As discussed, HRSA's determination that Sanofi's proposed Credit Model violates Section 340B rests on two erroneous legal conclusions: (1) that Section 340B does not allow rebates and (2) that Section 340B requires agency preapproval. Again, the government no longer maintains the first point, and its position on the second is contrary to law. But even if the government were correct about preapproval, HRSA's decision to deny such approval to Sanofi was arbitrary and capricious.

As the opening brief explained, HRSA's Violation Letter offers no reasoning aside from the two points above. Sanofi Opening Br. 27–29. And as explained above, neither point still holds—meaning the government's decision lacks any reasoning at all. A "conclusion accompanied by '*no* explanation' is the epitome of 'arbitrary and capricious' decision-making." *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (quoting *Commc'ns & Control, Inc. v. FCC*, 374 F.3d 1329, 1335–36 (D.C. Cir. 2004)). The omission of any basis for HRSA's decision is even clearer when considering Sanofi's detailed submissions to the agency, which the agency all but ignored. HRSA's Violation Letter failed to provide any explanation for its differential treatment

of ADAPs and covered entities' product-replenishment model—two other "rebate" models that HRSA neither required preapproval for nor determined were a violation of Section 340B. Sanofi Opening Br. 27–29. HRSA's Violation Letter likewise did not grapple with the rampant problems caused by the product-replenishment model or the benefits Sanofi's Credit Model would bring. *Id.* HRSA's decision to ignore all of these issues—which the government does not dispute were raised by Sanofi, *see* AR 348–62—only underscores the inadequacy of its decision. *See, e.g.*, *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023) ("Failing to distinguish 'prior orders in similar cases ... fails to satisfy the APA's reasoned decisionmaking requirement.'"); *El Rio Santa Cruz N'hd Health Ctr., Inc. v. U.S. Dep't of Health & Hum Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005) (finding HHS denial of coverage arbitrary and capricious "because HHS failed adequately to address relevant evidence before it").

Because HRSA's Violation Letter offered no justification beyond the agency's misreading of Section 340B, the government cannot salvage it in this Court. "An agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020); *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Yet the entirety of HRSA's response in this Court is impermissible backfilling that is conspicuously thin on citations to the administrative record. Indeed, HRSA invokes points that it purportedly made "in correspondence with *other manufacturers*." Opp. 16 (emphasis added). That is not an appropriate justification for HRSA's determination that *Sanofi's* proposal violated the statute. *See, e.g.*, *Regents of the Univ. of Cal.*, 591 U.S. at 24; *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 227 (D.D.C. 2007) ("Under established law, the Court may review only the reasons articulated in the agency decision itself.").

Even setting aside that the government's *post hoc* reasoning is not allowed, its arguments do not persuade. Start with the fact that HRSA has blessed the use of rebates for ADAPs. *See* Sanofi Opening Br. 5, 27–28. The government's lone argument for treating Sanofi's proposed use of rebates differently is that "many [ADAPs] used purchasing systems that made it difficult for them to access reduced cost drugs through direct discounts," while other covered entities have not raised a similar complaint. Opp. 16. But HRSA never developed a record on this point. Nor is there any basis for HRSA's apparent view that using rebates requires a special justification. The government admits that HRSA sees "upfront discounts as the preferred price reduction mechanism" simply "because covered entities generally preferred a discount system." Opp. 12. But the bald preferences of covered entities are not a permissible basis for the agency's decisionmaking. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency cannot "rel[y] on factors which Congress has not intended it to consider"). Particularly in light of Sanofi's evidence that the currently used models are facilitating rampant waste and abuse, *see infra* at 13, HRSA must do more to justify its position.

The government's attempt to distinguish the product-replenishment model fares no better. It contends that product replenishment requires only an initial purchase at wholesale price, while rebates would require continuous purchasing at wholesale prices. Opp. 17. This makes no sense on its own terms. Both the product-replenishment model and Sanofi's Credit Model apply rebates in the same way: an initial wholesale order followed by a rebate on the back end. In the replenishment model, the entity obtains credit for any eligible prescriptions it previously dispensed in the form of drugs at the 340B price. *See* Sanofi Opening Br. 9. In the Credit Model, the entity obtains credit for any eligible prescriptions it previously dispensed in the form of a rebate. In both models, the critical feature is that the reduced price is effectuated *after* the covered entity makes a

purchase.  The only distinction is whether the "rebate" comes in the form of a payment or a discount on a future purchase of the same drug.

Moreover, the government does not meaningfully dispute that Sanofi's model should "pay[] the credit *before* the wholesaler's bill to the covered entity becomes due" by offering rebates within 30 days.  AR 350.  This remains true even if a duplicate discount is found—as Sanofi would instead address the issue with the third party receiving the other discount.  *Id.*  All the government offers is speculation that "the covered entity would be at the mercy of the manufacturer to ensure that the credit is paid before the covered entity needs to pay the wholesaler."  Opp. 17–18.  But HRSA had no reason to doubt Sanofi's good faith, and no evidence to suggest that Sanofi's policy would result in covered entities actually paying the higher wholesale price in practice.  Nor did HRSA have any evidence to suggest that the potentially massive penalties for violating Section 340B would be inadequate for ensuring Sanofi's statutory compliance.  Contrary to certain *amici*'s insinuations, those penalties underscore that Sanofi has zero incentive to play games here, and every reason to avoid them.

Instead, the only evidence in the administrative record supports Sanofi's position that the Credit Model will work as described, *see* AR 350, and HRSA cannot simply jump to a contrary conclusion without "explain[ing] the evidence which is available, and … offer[ing] a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 52 (quotation marks omitted).  Stated differently, an agency's conclusion is arbitrary and capricious when, as here, it is based on "sheer speculation."  *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

At bottom, HRSA cannot treat two mechanisms differently if there is "no meaningful distinction" between them.  *Indep. Petrol. Ass'n of Am. v. Babbit*, 92 F.3d 1248, 1259–60 (D.C.

Cir. 1996).  And beyond its erroneous and unfounded speculation that the Credit Model would increase upfront costs in comparison to the replenishment model, the government argues only that "the covered entities voluntarily chose to receive discounts through the product replenishment process," and that Sanofi "seeks to impose its credit model … regardless of whether the *covered entities* believe that cash rebates are the optimal mechanism to receive 340B discounts."  Opp. 18 (emphasis added).  Again, however, Section 340B does not make manufacturers beholden to the preferences of covered entities.  *See Novartis*, 102 F.4th at 460.  The question here is whether Section 340B permits Sanofi's Credit Model (it does), and whether HRSA gave a reasoned and reasonable explanation for finding that this model violates Section 340B (it did not).  A bald assertion that one interested party deserves favorable treatment over another is a textbook example of an arbitrary decision.  *See, e.g.*, *State Farm*, 463 U.S. at 43.[4]

Finally, even now, the government steadfastly refuses to engage with Sanofi's detailed showing that the 340B Program is rife with waste and abuse; that the product-replenishment model facilitates these problems by commingling 340B and non-340B drugs; and that a credit model would provide much needed transparency to pricing that will benefit all stakeholders.  *See, e.g.*, Sanofi Opening Br. 28.  HRSA ignored these points altogether in the Violation Letter, and the government's only answer here is that HRSA is still evaluating the issue and has not yet resolved whether "the proposed rebate models are consistent with the 340B statute."  Opp. 18–19.

---

[4] The government misses the point with its remark that the product-replenishment model must be different because otherwise Sanofi "would not be seeking the Court's intervention to allow them to replace" it.  Opp. 18.  Sanofi's Credit Model is distinct in ways that seek to address the rampant waste and abuse in the 340B Program.  *See* Sanofi Opening Br. 8–14.  The question for HRSA— which it never answered—was why Sanofi's Credit Model would be inappropriate when the agency saw no problem with the product-replenishment model.  And Sanofi filed suit because HRSA threatened it with draconian consequences if it launched the Credit Model.

But HRSA issued an unconditional rejection of Sanofi's program, declaring that "Sanofi's credit proposal, if implemented, violates Sanofi's obligations under the 340B statute" and "subjects Sanofi to potential consequences, such as termination of Sanofi's … PPA" or crushing penalties. AR 425.  HRSA thus stated that it "expects Sanofi to cease implementation … and to inform HRSA" by a particular date of that fact "to provide adequate notice to covered entities."  *Id.*  At no point did HRSA state that it was still considering the issue.  Instead, it simply ignored Sanofi's well-founded concerns and found that Sanofi's program violates Section 340B.  That is not a proper response under the APA.  *See, e.g.*, *El Rio*, 396 F.3d at 1278.[5]

## II.    HRSA Erred in Concluding That Sanofi Could Not Impose a Patient Eligibility Condition.

The government has also now backtracked from HRSA's rejection of Sanofi's patient eligibility condition—under which, for certain hospital covered entities, Sanofi will provide a 340B credit only when the drugs are provided to the covered entities' patients.  In its Violation Letter, HRSA claimed that Section 340B prohibited this condition.  AR 425 & n.1.  But the government now effectively concedes that is not the case, which confirms that the Violation Letter was contrary to law.  And although the government insists that HRSA's action was not arbitrary

---

[5] *Amici* try to shore up the government's position with a claim that Sanofi's Credit Model would impose heavy costs on 340B hospitals. Dkt. 38 ("AHA Br.") 19–24.  But HRSA did not reach that conclusion, much less develop a record to support it.  And even *amici* support this claim only with speculative self-reports that do not even engage with the specific terms of Sanofi's model.  For example, *amici* wrongly assume that hospitals will have to front the undiscounted wholesale price for 340B drugs before receiving a rebate or credit.  *Id.* at 19–22.  More fundamentally, as *amici* acknowledge, "no legislation pursues its purposes at all costs."  *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987).  And by helping prevent waste and abuse, Sanofi's Credit Model would further—not frustrate—one of Section 340B's core purposes.  *See, e.g.*, 42 U.S.C. § 256b(a)(5) (prohibiting duplicate discounts and diversion).

and capricious, its concession that Section 340B permits the patient eligibility condition knocks out the only rationale that could possibly sustain the agency's action.

### A.   The Government Does Not Dispute That Section 340B Permits Sanofi's Patient Eligibility Condition.

In its opening brief, Sanofi explained that Section 340B allows it to confirm that a prescription is going to a covered entity's "patient" before providing a 340B credit, as doing so would prevent unlawful diversion.  *See* Sanofi Opening Br. 29–33.  The government no longer disputes Sanofi's statutory right to implement this condition.  Instead, without disputing the condition's legality, the government argues only that HRSA needed more time to consider the issue because Sanofi's proposal would be "a change to how the 340B program has operated."  Opp. 21–22.

The government also does not claim that Section 340B prohibits any other aspect of Sanofi's patient eligibility condition—such as Sanofi's definition of "patient" (which is taken from HRSA guidance) or Sanofi's requirement that covered entities submit certain data (which *Novartis* permits).  *See id.* at 19 (acknowledging that Sanofi will use data that hospitals submit "to verify that the individual is a patient of the covered entity *under the Agency's guidance*" (emphasis added)).  The government has therefore conceded that Section 340B permits this condition.  *Gandhi v. Ctrs. for Medicare & Medicaid Servs.*, 665 F. Supp. 3d 49, 58 (D.D.C. 2023).  Because HRSA's decision rested on a contrary view—one that is now conceded to be contrary to law—it should be set aside for this reason alone.  *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1220 (D.C. Cir. 2024) ("An agency action based on a flawed interpretation of a statute or regulation is contrary to law.").

Four hospital associations, participating as *amici*, read Section 340B differently.  They contend that Section 340B's audit procedures implicitly preclude Sanofi's patient eligibility

condition.  *See* Dkt. 38 ("AHA Br.") 7–9.  They also argue that Sanofi's data requirements will impose costs on 340B hospitals that will undercut Section 340B's purpose.  *Id.* at 19–25.  But again, this Court's review is limited to the grounds HRSA invoked in its Violation Letter—and HRSA did not raise either of these points (which also are not supported by the administrative record).  *Chenery*, 332 U.S. at 196.  Even now, HRSA does not argue that Section 340B *prohibits* Sanofi from implementing its patient eligibility condition or that the data requirements will be too costly for 340B hospitals.  *See Food & Water Watch v. FERC*, 28 F.4th 277, 290 (D.C. Cir. 2022) ("amici are powerless to revive an argument the parties failed to preserve").  Accordingly, the Court should not entertain *amici*'s arguments.

But regardless, those arguments fail on their own terms.  *Amici* try to turn a *procedural* enforcement provision (audits) into a *substantive* limitation on Sanofi's right to set the terms of its offers.  But that argument—if it ever had teeth—did not survive *Novartis*, which upheld efforts by manufacturers to prevent duplicate discounts and diversion *outside* of those procedures.  102 F.4th at 458, 464.  Nor does it square with common sense.  Just as a law against shoplifting does not mean stores cannot try to stop theft, the existence of back-end remedies does not suggest that manufacturers are powerless to stop statutory violations in the first place.

Indeed, *Novartis* rejected the same argument *amici* press here, reasoning that "the statutory audit and dispute-resolution mechanisms … serve to ensure compliance with the various obligations that section 340B imposes" but "do not speak to the scope of those underlying obligations, such as what a manufacturer must do to make the requisite 'offer' at the requisite 'price.'"  *Id.* at 461–62.  At most, "section 340B establishes the precise metes and bounds of *audits and administrative adjudications*."  *Id.* at 462 (emphasis added).  Those "metes and bounds" for addressing past violations do not cabin attempts to stop violations.  *See Sanofi Aventis U.S. LLC v.*

*U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 705 (3d Cir. 2023) ("Section 340B's compliance measures do not implicitly preclude delivery limits," and manufacturers are permitted to "tack on measures of their own").

*Amici*'s attempts to distinguish *Novartis* are unavailing. *Amici* argue that *Novartis* addressed "limits related to distribution" for which Section 340B is "silent," AHA Br. 16–17, but Section 340B does not limit manufacturers' ability to take affirmative measures to *prevent* diversion—which is not only unlawful under Section 340B but disqualifies a covered entity from eligibility for 340B pricing. Because the statute does not prevent manufacturer attempts to stop diversion, Sanofi "may act freely" to ensure that its provision of the 340B price does not cause diversion. *Novartis*, 102 F.4th at 460.

Nor can *amici* sidestep *Novartis* on grounds that the manufacturers there could not audit the contract pharmacies. *See* AHA Br. 17 (noting that "the 340B statute does not provide for audits of [contract pharmacies]"). *Novartis* upheld a requirement that *covered entities* "provide claims data associated with all 340B contract pharmacy orders to a third-party platform, to facilitate efforts to police diversion and duplicate discounts." 102 F.4th at 458 (cleaned up). Because that same information could have been obtained through an audit of the covered entities, *amici* are wrong that audit rights foreclose all other efforts to prevent diversion. Certainly *amici* are wrong to suggest that these audit rights preclude Sanofi's request for routine data, when *Novartis* approved a similar request. *See* AHA Br. 10. Again, *amici* conflate back-end enforcement with front-end prevention.[6]

---

[6] *Amici* also claim that Sanofi would jump the gun if it denied a 340B discount before the audit and dispute-resolution processes result in a finding of diversion. AHA Br. 11–12. But if Sanofi knows that a drug was provided to a non-patient, Sanofi would itself *create* diversion if it provided a 340B credit for that drug. And it would be "absurd," *Novartis*, 102 F.4th at 461, if Section 340B both prohibited diversion and simultaneously required that Sanofi knowingly facilitate it, on the

The story is much the same with *amici*'s invocation of *Astra*, 563 U.S. 110, which they say precludes any attempt at "*private* enforcement" of the 340B statute.  AHA Br. 8.  *Astra* said nothing about the terms that can be appropriately included in an offer of the 340B price.  Nor did *Astra* say anything about whether manufacturers can use those terms to attempt to stop unlawful diversion.

### B.    HRSA Did Not Provide a Reasoned Explanation for Objecting to Sanofi's Patient Eligibility Condition.

HRSA's rejection of the patient eligibility condition was also arbitrary and capricious. Despite conceding that the patient eligibility condition is permitted under Section 340B—thus conceding that the Violation Letter's rationale was wrong—the government nonetheless insists that HRSA's rejection of the condition was not arbitrary and capricious.  But the explanation that the government now offers—that HRSA needs more time to evaluate the condition, because it would purportedly shift enforcement authority from the agency to Sanofi—was entirely absent from the Violation Letter.  In any event, this newly minted rationale misunderstands how Sanofi's patient eligibility condition would operate and ignores how this approach would help combat the rampant diversion that now plagues the 340B Program.

In the Violation Letter, HRSA's sole basis for rejecting the patient eligibility condition was its view that the condition violates Section 340B.  But the government now retreats from that position, conceding that Section 340B does *not* prohibit the condition—so this aspect of the Violation Letter rests on "a faulty legal premise."  *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir.

---

theory that Sanofi might be able to recoup the discount after the audit and dispute-resolution processes have run their course (possibly years later).  Even the agency guidance cited by *amici* does not go that far, instead stating only that manufacturers cannot stop all 340B sales to a covered entity while an audit is ongoing.  *See* 61 Fed. Reg. 65,406, 65,408 (Dec. 12, 1996) (cited at AHA Br. 12).  And in all events, Sanofi would risk liability under Section 340B if it improperly denied 340B pricing.

1985).  This alone requires the Court to set aside HRSA's rejection as arbitrary and capricious.  *See* Sanofi Opening Br. 33–34 (citing cases).[7]

The government takes a different tack in its brief.  Now, it claims that HRSA needs more time to consider the patient eligibility condition because the policy would allegedly "change … how the 340B program has operated for more than thirty years" by shifting enforcement responsibility away from HRSA.  Opp. 19, 22.  For this reason alone, HRSA claims it was justified in preventing Sanofi's implementation of the patient eligibility condition "at this time."  *Id.* at 22.

This reasoning is not up to snuff.  For starters, as before, HRSA's "*post hoc* rationalization[]" is "not properly before" the Court.  *Regents of the Univ. of Cal.*, 591 U.S. at 22; *Chenery*, 332 U.S. at 196; *see supra* Part I.C.  This Court's review is confined to the reasons HRSA gave in the Violation Letter, which did not offer the above rationale, let alone state that it was merely rejecting Sanofi's proposal "at this time."  HRSA instead reached a *final* decision on the legality of Sanofi's Credit Model.  AR 425.  That is surely why the government has not argued here that final agency action is absent.  *See Marcum v. Salazar*, 694 F.3d 123, 128 (D.C. Cir. 2012) (holding that the government "forfeited" its finality objection because the APA's final agency action requirement "must be raised by the agency in order to be preserved").

In any event, HRSA is wrong to suggest that the patient eligibility condition would "change" the 340B Program by shifting enforcement responsibility.  *See* Opp. 19–22.  Sanofi's policy would not disturb Section 340B's existing enforcement mechanisms.  Instead, Sanofi would simply complement those procedures by attempting to prevent diversion in the first place.  *See*

---

[7] To the extent the Violation Letter relied on HRSA's nonexistent preapproval authority to reject the patient eligibility condition, it is arbitrary and capricious for the same reason.  *See supra* Part I.B (explaining that Section 340B does not grant the Secretary preapproval authority).

Sanofi Opening Br. 32.[8]  Because Section 340B does not limit a manufacturer's ability to take such action, Sanofi is free to "tack on" its patient eligibility condition.  *Sanofi*, 58 F.4th at 705; *Novartis*, 102 F.4th at 460.

Indeed, as the government's own brief reveals, Section 340B's audit and dispute-resolution processes are burdensome and time-intensive.  *See* Opp. 20–21 (detailing audit procedures); *see also* Sanofi Opening Br. 7–8 (same).  In contrast, with the patient eligibility condition, Sanofi would collect standard data upfront in a manner that even the government does not argue is burdensome.  Moreover, covered entities frequently resist audits—and have even filed lawsuits to attempt to stop them.[9]  And a manufacturer must complete an audit before it can access the statute's dispute-resolution process.  42 U.S.C. § 256b(d)(3)(A).  So even if a manufacturer secures HRSA's approval to conduct an audit—which requires enough evidence to establish "reasonable cause" that a violation has occurred—meaningful enforcement of the 340B statute may still be a long way off (if it ever comes at all).  *See* Dkt. 44 (Pls.' Joint Response to Intervenors) 23–24.  It is unreasonable to think these back-end remedies should render a manufacturer powerless to prevent unlawful diversion before it occurs.

Moreover, even under Sanofi's patient eligibility condition, audits would still play an important and distinct role in policing diversion.  For one thing, Sanofi's condition would apply

---

[8] Sanofi would not, as HRSA asserts, "audit each individual claim for a 340B discount."  Opp. 21.  Sanofi's data requirement bears no resemblance to the far more intrusive and complex audit process.  *See id.* at 20–21 (detailing statutory audit procedures).

[9] *See, e.g.*, *Oregon Health & Sci. Univ. v. Engels*, 24-CV-2184 (RC) (D.D.C. filed July 24, 2024); *MaineGeneral Med. Ctr. v. Engels*, 24-CV-2187 (RC) (D.D.C. filed July 24, 2024); *University of Rochester v. Engels*, 24-CV-2268 (RC) (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr. v. Engels*, 24-CV-2563 (RC) (D.D.C. filed Sept. 6, 2024); *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (RC) (D.D.C. filed Oct. 22, 2024); *University of Kan. Hosp. Auth. v. Kennedy*, No. 25-CV-549 (RC) (D.D.C. filed Feb. 24, 2025).

only to hospital covered entities. AR 411. And even with those covered entities, Sanofi's model is unlikely to prevent all diversion—audits would still be necessary to detect diversion that slips through the cracks. More fundamentally, the patient eligibility condition will work hand-in-glove with audits by helping Sanofi compile the evidence needed to establish "reasonable cause" to perform an audit in the first place.

Finally, HRSA once again fails to provide any answer to the program-integrity problems that plague the current system, and does not dispute that Sanofi's patient eligibility condition would help clean things up. *See* Sanofi Opening Br. 8–11, 34–35; AR 364, 588–608; *New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) (agencies "must respond meaningfully to the arguments raised before" them (cleaned up)). Even now, HRSA still fails to acknowledge that the 340B Program suffers from rampant waste and abuse—so it is no surprise that the agency also overlooks the failure of existing "safeguards" (Opp. 19) to ensure program integrity.

For all these reasons, HRSA's rejection of Sanofi's patient eligibility condition is not the product of "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). The Court should therefore vacate that action as arbitrary and capricious.

## CONCLUSION

The Court should grant Sanofi's motion for summary judgment and deny HRSA's cross-motion.

Dated: April 7, 2025                                   Respectfully submitted,


                                                      _/s/ Rajeev Muttreja_____

                                                      Rajeev Muttreja (admitted _pro hac vice_)
                                                      JONES DAY
                                                      250 Vesey Street
                                                      New York, New York 10281
                                                      Telephone:  (212) 326-3939
                                                      Facsimile:  (212) 755-7306
                                                      rmuttreja@jonesday.com

                                                      Noel J. Francisco (D.C. Bar No. 464752)
                                                      JONES DAY
                                                      51 Louisiana Avenue, N.W.
                                                      Washington, D.C. 20001
                                                      Telephone:  (202) 879-3939
                                                      Facsimile:   (202) 626-1700
                                                      njfrancisco@jonesday.com


                                                      _Counsel for Plaintiff_
                                                      _Sanofi-Aventis U.S. LLC_