UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANOFI-AVENTIS US, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT F. KENNEDY, JR, Secretary of Health and Human Services, et al., <br><br> Defendants. | Civil Action No. 24-3496 (DLF) |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, the Secretary of Health and Human Services ("Agency") and the Administrator of the Health Resources and Services Administration, respectfully submit this reply in further support of their motion for summary judgment.

## INTRODUCTION

In its reply and cross opposition ("Opp'n" (ECF No. 46)), Plaintiff Sanofi-Aventis US, LLC fails to advance arguments that would warrant denying Defendants' motion for summary judgment. First, Plaintiff's argument that drug manufacturers can unilaterally decide whether 340B price reductions should be offered through discounts or rebates lacks support in the text of the statute, which requires that the 340B ceiling price takes into account "any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). Second, because the credit model that Plaintiff proposed would change the way that the 340B program has operated for more than thirty years, the Agency justifiably objected to Plaintiff's plan to unilaterally implement its credit model. AR 424-25. Thus, the Agency's decision was not arbitrary and capricious.

## ARGUMENT

**I.  The Secretary's Authority to Prevent Manufacturers from Unilaterally Imposing 340B Credit Models is Supported by the Text of the Statute.**

The ceiling price that a manufacturer must offer to a covered entity "tak[es] into account any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). Despite the statute's plain meaning, Plaintiff asks the Court to rewrite the statute to remove the Secretary from the process. Plaintiff dismisses that the ordinary meaning of the term "provide" can mean "to stipulate." Opp'n at 10. But in addition to the Meriam-Webster definition that Defendants cited in their opening brief, Def Mot. at 12 (ECF No. 41-1), the Oxford English Dictionary, "one of the most authoritative on the English language," *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012), defines "provide" as "to stipulate in a will, statute, etc." Provide, Oxford English

Dictionary https://www.oed.com/dictionary/provide_v?tab=meaning_and_use#27997055. That is precisely what Congress did here.  The phrase "as provided by the Secretary" means that the Secretary can stipulate whether a price reduction, i.e. "the amount required to be paid" is effectuated, i.e. "tak[en] into account" by a rebate or discount.  42 U.S.C. § 256b(a)(1).

Plaintiff argues that the phrase "taking into account any rebate or discount, as provided by the Secretary," Opp'n at 10, only means that the Secretary has the authority to calculate the rebate or discount amount, but such a reading would make the term "provided" surplusage.  Further, if Congress intended the statute to simply mean that the Secretary could calculate the price reduction amount, then there would be no reason to include the terms "rebate" and "discount" next to "as provided by the Secretary." 42 U.S.C. § 256b(a)(1).  The statue would instead just reference the Secretary's authority to calculate a price reduction.  *See Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) ("if possible, we are to construe a statute so as to give effect to every clause and word") (cleaned up).  Moreover, the term "provide" can be used to state "a general, independent rule." *Alaska v. United States*, 545 U.S. 75, 106 (2005); *see also, Republic of Iraq v. Beaty*, 556 U.S. 848, 858 (2009) (quoting, *United States v. Morrow*, 266 U.S. 531, 534 (1925)) ("a proviso can also be used 'to introduce independent legislation.'").  Using a proviso to state a general independent rule "may be lazy drafting, but is hardly a novelty." *Beaty*, 556 U.S. 858.  For example, the Supreme Court held that a statute reading "'the President may suspend the application of any provision of the Iraq Sanctions Act of 1990: . . . Provided further, that the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism . . . .' gave the president "an additional power' in the second proviso." *Id.* (citation omitted).  "It was not, on any fair reading, an exception to, qualification of, or restraint on the principal power." *Id.*

So too here, the phrase "as provided by the Secretary" gives the Secretary the authority to stipulate whether a 340B discount is effectuated through a rebate or upfront discount.

Plaintiff's alternative theory that the Secretary may only regulate the implementation of rebates and discounts within the Pharmaceutical Pricing Agreement ("pricing agreement") also lacks merit. Opp'n at 11. As the Agency explained, the pricing agreements are not a contract or a regulatory vehicle, rather, the pricing agreements "are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of [Health and Human Services]." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). Plaintiff attempts to disregard this precedent by arguing that the issue in *Astra USA* 563 U.S., at 113 was whether covered entities can sue to enforce the pricing agreements. Opp'n at 12. But *Astra USA*, 563 U.S., at 114, held that the answer to that question was no because "[i]f 340B entities may not sue under the statute, it would make scant sense to allow them to sue on a form contract implementing the statute, setting out terms identical to those contained in the statute." The pricing agreement and the statute are "one and the same." *Id.* Consistent with the Supreme Court's holding that the pricing agreement and the statute are "one and the same," the Agency could not amend pricing agreements for different manufacturer or covered entity types.

Accepting Plaintiff's argument that the Secretary should create an individualized pricing agreement with each manufacturer specifying whether that manufacturer should offer rebates or discounts would not only contradict binding Supreme Court precedent but would also contradict long-standing Agency practice. Each manufacturer that elects to participate in the 340B Program signs the same pricing agreement with the Secretary. AR 036-47. Indeed, when the Agency debuted the program on December 15, 1992, the Agency sent manufacturers copies of the agreement via certified mail and requested that manufacturers who wished to opt-in to the program

sign and return the agreements to the Agency by January 6, 1993.  58 Fed. Reg. 27,289, 27,291 (May 7. 1993).  Even though the pricing agreements were designed to be and have always been form agreements, in creating the program, Congress anticipated that the Secretary would use whichever price reduction "mechanism that is the most effective and most efficient from the standpoint of each type of covered entity."  H.R. Rep. No. 102-384, pt. 2, at 16 (1992).

The fact that the Agency has not required a manufacturer to seek approval for a direct discount, Opp'n at 12-13, does not mean that the Agency would simply acquiesce in a manufacturer imposing a type of discount system that the Agency believed would undermine the program.  Indeed, through its program guidance, the Agency has long maintained that the 340B statute gives it the authority to adopt the price reduction mechanism "that is the most effective and most efficient" for any given type of covered entity.  62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (quoting H.R. Rep. No. 102-384, pt. 2, at 16).

Plaintiff notes that the Agency never preapproved the rebate models that have been used for 340B sales to AIDS Drug Assistance Programs.  Pl. Mot at 14-15.  But this assertion is only part of the story of how the Agency came to "recognize" a rebate option for AIDS Drug Assistance Programs.  63 Fed. Reg. 35,239 (Jun. 29, 1998).  In recognizing the rebate system, the Agency stated,

> [a]lthough the discount system is functioning successfully for most covered entities, most [AIDS Drug Assistance Programs] have drug purchasing systems that have prevented their participation in the section 340B discount program. The use of a rebate option (in addition to the discount mechanism) should allow these groups to access section 340B pricing.

62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).

In other words, the purchasing system that a type of covered entity, specifically the AIDS Drug Assistance Programs, used was preventing that type of covered entity from accessing the

Program, and the Agency allowed rebates as a solution to this obstacle.  In issuing this guidance, the Agency did not foreclose that it has the authority to block the rebate system or take enforcement action if the Agency was not convinced that the rebates would further the objectives of the 340B program.  *Id.*  Quite the opposite.  The Agency declined to recognize rebate models generally for other types of covered entities and emphasized that "this notice only recognizes a rebate option for [AIDS Drug Assistance Programs] that receive assistance under Title XXVI of the Public Health Service Act."  63 Fed. Reg. at 35,241-42.  Thus, the Agency's position that a manufacturer cannot unilaterally choose whether to offer 340B-priced drugs to covered entities through discounts or rebates without Secretarial input is not a "novel reading" of the 340B Statute. "The longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is."  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024).  Here, the Agency's longstanding practice has been to guard its prerogative to determine the most apt price reduction mechanism for a given type of covered entity.  62 Fed. Reg. at 45,824.

      Finally, Plaintiff seeks to minimize the usefulness of the House Committee Report as an interpretive tool.  Opp'n at 13-14.  But "'[e]xtrinsic materials' such as legislative history, 'have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.'"  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 338 (D.C. Cir. 2020) (*quoting, Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).  Here, to the extent that the Court finds that there is any ambiguity in the statute, the House Energy and Commerce Committee's comment that the 340B price reductions "would be implemented, at the discretion of the Secretary, either by a point-of-purchase discount, a rebate, or other mechanism," provides insights into Congress's intent and supports the Agency's interpretation of the statute.  H.R. Rep. No. 102-384, pt. 2, at 12.

Accordingly, the Agency's decision to prevent Plaintiff from unilaterally implementing the credit model was within the Agency's statutory authority.

## II.     The Agency's Decision Was Not Arbitrary and Capricious.

The Agency's decision was supported by the administrative record and thus not arbitrary and capricious. *See Kaufman v. Perez*, 745 F.3d 521, 527 (D.C. Cir. 2014) (noting that agency factual findings may be "set aside . . . only if unsupported by substantial evidence on the record as a whole"). As an initial matter, in its communications with Plaintiff, the Agency did not take position that the 340B statute prohibited credits or rebates. AR 380, 424-25. Plaintiff's suggestion that the Agency backpedaled in litigation is based on a misunderstanding of the Agency's letter. *Compare,* Opp'n at 14, *with*, AR 425. The Agency objected to Plaintiff implementing a credit model without Secretarial approval because of the disruption that it would cause to the 340B Program. AR 425 ("The Secretary has not 'provided' that the credits described in Sanofi's notice should be 'tak[en] into account' in the 'amount required to be paid' . . ."). Crucially, the Agency has not rejected credit models outright, instead it has simply stated that it could not approve the credit models "to date." AR 380.

Plaintiff argues that the Agency cannot rely on its correspondence with other manufacturers to defend its position. Opp'n at 15. But this correspondence is part of the administrative record, and the administrative record must include "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 10 (D.D.C. 2018) ("The complete record is comprised of 'all documents and materials directly or indirectly considered by the agency,' regardless of outcome"). During the administrative phase, Plaintiff was aware that the Agency was considering its credit model along with other

manufacturers' proposals because the Agency specifically informed Plaintiff that the Agency had "received inquiries from manufacturers related to different proposed rebate models for the 340B Program," and that the Agency was "in the process of reviewing these varied inquiries, which would significantly and unilaterally alter the administration of the Program." AR 406. Because the Agency considered the correspondence with all manufacturers as part of its decision on Plaintiff's credit model, the Court must consider this correspondence as part of its review of "the whole record or those parts of it cited by a party[.]" 5 U.S.C. § 706.

Plaintiff reiterates its argument that the Agency's decision is arbitrary and capricious because the Agency did not treat its proposal like the AIDS Drug Assistance Program rebates. Opp'n at 14-15, 16. But Plaintiff fails to address the important distinction between the circumstances that led to the adoption of rebate models in the AIDS Drug Assistance Programs, namely that the rebate models were permitted because the purchasing systems that many AIDS Drug Assistance Programs used made it difficult to access the 340B Program under a direct discount system, and the situation here. 62 Fed. Reg. at 45,824. Notably, there is no evidence that the current 340B price reduction systems are preventing covered entities from accessing the program. "An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005). The Agency has provided a reason for treating the rebate models that Plaintiff seeks to implement differently from those used to effectuate price reductions for AIDS Drug Assistance Programs and thus Plaintiff cannot rely on the Agency's treatment of rebate models for AIDS Drug Assistance Programs as evidence that the Agency's decision on its credit model was arbitrary and capricious. *Contra,* Opp'n at 16.

Plaintiff also ignores the distinctions between the credit models and the product replenishment models. Opp'n at 16. Asking a covered entity to make one initial purchase at the wholesale cost and then make subsequent purchases at a discount is different than what Plaintiff is asking of covered entities, namely, to make every purchase at the wholesale cost and then rely on the diligence of manufacturer to reimburse them for the difference between the wholesale cost and the 340B price before the covered entity needs to pay the wholesaler. AR 350. Payment of the credit would be conditioned on Plaintiff's validation of the data that the covered entity submits and at Plaintiff's discretion. AR 425 n.1. In imposing the credit model on covered entities, Plaintiff is asking the covered entities to potentially pay higher upfront costs which "reduces the hospitals' resources available for other patient care." AR 568. Further, unlike the credit model, the covered entities have voluntarily chosen to use the product replenishment process. AR 203. Plaintiff notably does not claim that the covered entities forced it to participate in the product replenishment system against Plaintiff's will, but Plaintiff nevertheless seeks to force the covered entities to acquiesce to Plaintiff's preferred system. *See generally,* Opp'n.

Moreover, Plaintiff's proposed credit model requires further scrutiny for the additional reason that Plaintiff would only pay the credit to the covered entities if the covered entities timely submit "purchase claims data" and "healthcare encounter data." AR 424-25. Although the Agency is not opposed to manufacturers requiring covered entities to submit this data in the abstract, and the violation letter does not state otherwise, Plaintiff seeks to use the data to monitor transactions for duplication and diversion independently rather than in partnership with the Agency, which has been the practice throughout the program's existence. *Id.;* 61 Fed. Reg. 65,406 (Dec. 12, 1996). This system would mark a departure from the current regime where covered entities purchase drugs through direct discounts, and a manufacturer can ensure that covered entities are not taking

duplicative discounts or diverting drugs to non-340B patients through audits based on "reasonable cause."  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).

The Agency's concern with Plaintiff's proposal to require covered entities to submit this type of data was based on Plaintiff using the data to effectuate a credit model that the Secretary has not "provided" for.[1]  AR 424-25.  Under the credit model that Plaintiff proposes, the covered entity would need to place an order for 340B drugs at the wholesale acquisition cost.  AR 350.  Plaintiff would pay the credit to the covered entity only if the covered entity submits claims data and the patient encounter data to Plaintiff and Plaintiff validates the data.  AR 424-45.  This saddles the covered entities with uncertainty that they do not experience under the current system.  *Id*.  Currently, the covered entities enjoy the certainty that they will be able to obtain the 340B drugs at the 340B price because they receive that price upfront without the data submission conditions that Plaintiff proposes to implement.  *Id*.

Plaintiff minimizes the availability of audits and the alternative dispute resolution process as tools to address its concerns regarding duplication and diversion.  Opp'n at 25.  However, it is not difficult for a manufacturer to establish the reasonable cause for duplication or diversion that will unlock the audit process.  "Reasonable cause means that a reasonable person could believe that a covered entity" is violating the 340B statute through duplication or diversion.  61 Fed. Reg. at 65,409.  A manufacturer can demonstrate reasonable cause with evidence such as "significant

---

[1]  Plaintiff appears to argue that *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024) gives Plaintiff unfettered discretion to collect claims data.  *See* Opp'n at 20.  But that argument stretches the holding in *Novartis*.  *Novartis*, 102 F.4th at 464, held that "section 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities[,]" and "the delivery conditions at issue in the lawsuit do not violate section 340B on their face."  The Court "d[id] not foreclose the possibility that other, more onerous conditions might violate the statute."  *Id*.

changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." *Id*. at 65,406. Additionally, the Agency does not need to "approve" the audit workplan for a manufacturer to conduct an audit. *Id.* The Agency simply reviews the plan to ensure that audit work performed is "relevant to the audit objectives while protecting patient confidentiality and information of the covered entity which is considered proprietary." *Id.* If, based on a manufacturer's submission, the Agency finds reasonable cause to believe that a violation is occurring, the Agency "will not in intervene" in the audit. *Id*. at 65,410. Plaintiff argues that covered entities have resisted cooperating with the audits, Opp'n at 25, but the Agency has advised covered entities to cooperate with audits and has defended this position in lawsuits from various covered entities challenging the audits. *See e.g., University of Wash. Med. Ctr. v. Kennedy,* Civ. A. No. 24-2998 (RC) (D.D.C.)*; Oregon Health & Sci. Univ. v. Engels*, Civ. A. No. 24-2184 (RC) (D.D.C.)*; Children's Nat'l Med. Ctr. v. Engels*, Civ. A. No. 24-2563 (RC) (D.D.C.).

The Agency appropriately weighed the covered entities' concerns about the rebate and credit models against the manufacturers' preferences because the covered entities are the beneficiaries of the 340B program. 42 U.S.C. § 256b(a)(1) (the pricing agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price . . ."). The purpose of the 340B Program was to help covered entities "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12. If the Agency were to allow manufacturers to implement a price reduction mechanism that made it more difficult for the covered entities to stretch their resources, the Agency would undermine the purpose of the Program. Because the Agency oversees the transactions between the manufacturers and the

covered entities, the Agency could not limit its consideration of proposed changes to the methods of effectuating price reductions only to how the changes will affect the manufacturers. See generally, 42 U.S.C. § 256b(a)(1).

Finally, Plaintiff dismisses the Agency's arguments that it has not had a sufficient opportunity to conduct a thorough review of the credit model to ensure that the credit model will not undermine the 340B program or adversely affect covered entities or the patients that the covered entities serve. Opp'n at 18. Drug manufacturers did not begin to propose to the Agency widespread use of rebates in place of upfront discounts until June 2024. AR 049, 507. When these manufacturers did not obtain instant approval from the agency, they bypassed the Agency and filed lawsuits beginning with Johnson & Johnson on November 12, 2024. See *Johnson & Johnson Health Care Systems Inc. v. Kennedy*, Civ. A. No. 24-3188 (RC) (D.D.C.). The Agency notified Plaintiff that if it proceeded with implementing the models "at this time," the Agency would initiate enforcement action. See e.g., AR 425.

The Agency does not dispute that the violation letter is a final agency action reviewable under the Administrative Procedures Act, 5 U.S.C. § 704, but the Agency did not issue the letter because it had conducted a thorough review of the proposed credit model. Rather the Agency issued the letter because on November 22, 2024, Plaintiff notified covered entities that it was going to begin implementing a credit model on January 6, 2025, and beginning on that date "340B pricing will no longer be available through wholesalers," but instead would be available through a credit. AR 410. Plaintiff issued this notice to the covered entities even though the Agency advised Plaintiff the day prior that "implementing a rebate proposal without Secretarial approval would violate" the 340B statute. AR 406. In other words, the November 22, 2024, enforcement letter was necessary to ensure that Plaintiff did not proceed with implementing the unapproved credit

model on January 6, 2025. But the Agency has not ruled out providing for the credit model following a careful review and evaluation of that model consistent with the goals of the program. AR 347 ("to date, the Secretary has not provided for such a credit model").

Although many of the manufacturers now prefer rebates or credits the covered entities prefer upfront discounts. See AR 635-39. Because the Agency has not yet fully considered "all aspects of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983), the Agency justifiably declined to approve Plaintiff's credit model to preserve the 340B program as it has operated since 1992.

## CONCLUSION

For these reasons and the reasons stated in Defendants' cross motion for summary judgment, the Court should enter summary judgment in Defendants' favor and deny Plaintiff's motion for summary judgment.

| | |
|---|---|
| Dated: April 21, 2025<br>Washington, DC | Respectfully submitted,<br><br>EDWARD R. MARTIN, JR., D.C. Bar #481866<br>United States Attorney<br><br>By:  */s/ John J. Bardo*<br>JOHN J. BARDO, D.C. Bar #1655534<br>Assistant United States Attorney<br>601 D Street, NW<br>Washington, DC 20530<br>(202) 870-6770<br><br>*Attorneys for the United States of America* |